Burr S. Stottle, Administrator of Estate of Steve Martin, v. Chicago, Rock Island & Pacific Railway Company, Appellant. — 18 S. W. (2d) 433.

Division Two, March 2, 1929.

1192

*Luther Burns, Henry S. Conrad, L. E. Durham* and *Hale Houts* for appellant.

*Atwood, Wickersham, Hill & Chilcott* and *Elon J. Levis* for respondent.

1194

WHITE, J.—Steve Martin was killed about August 18, 1923, while employed by defendant company in switching cars in defendant's yards in Kansas City, Kansas. He left a wife and two small children. Burr S. Stottle, his administrator, filed this suit for damages on account of that death, alleging among other things that Martin and defendant were engaged in interstate commerce at the time of his death and that it was caused by violation of the Safety Appliance Act. Other allegations of negligence appear in the petition.

Defendant in its answer, after a general denial, pleaded assumption of risk and contributory negligence.

On a trial in the Circuit Court of Jackson County, May 8, 1925, a jury returned a verdict for plaintiff in the sum of twenty-eight thousand dollars. The court rendered judgment on that verdict, and the defendant appealed.

Martin at the time was a member of a switching crew in the employ of the defendant, and was engaged in "breaking up" a "transfer" of cars that had been brought from the yards of the M. K. & T. Railway Company (called the Katy), in Rosedale, Kansas. The string of cars, called a "drag," was brought from the Katy yards in Kansas across the state line into Missouri, and then into what was called the transfer yards, in Kansas, where the accident occurred. The drag was brought along the "lead" track which ran from the southwest to the northeast. From this lead nine spur tracks branched off from the south side and ran nearly due east. The seven cars composing the drag brought in from the Katy yard appeared in a list in the possession of the foreman who testified that a like list was in possession of Martin, the deceased. The list was as follows:

x
3
8
3
7
9
x

"X" at the bottom of the list was the car farthest from the engine, and the first to be "kicked" on to a spur track. The numbers after that designated spur tracks upon which the several cars were to go. For instance, Car No. 9 indicated that it was to go to track 9, and car No. 7 indicated that it was to go on to track 7, and so on.

Martin was called a field man. His duty was to throw switches, ride cars that were shunted on to the spur tracks when necessary to set the brakes; and to couple and uncouple cars. The crew with which he was working consisted of himself, Stollard the foreman, and one Parks who is mentioned as the head man or pin puller. Besides these, the engineer and fireman.

In putting cars on to the spur tracks usually they were "kicked" from the lead onto the proper tracks and allowed to run by gravity. If no cars were on the spur it was the duty of Martin to ride such car and set the brake so as to stop it when it got to the desired point. The first car, X, was set on spur track No. 2. Then the next car, 9, was kicked onto track 9. Martin rode that car and set the brake. After that he was somewhere off the lead along track 7. Then the next car, 7, was shunted in upon track 7. The plaintiff's evidence tends to show it was shoved in. Defendant's evidence tends to show that it was kicked in and that it was not necessary for Martin, the

field man, to ride that car because it would be stopped by cars already upon the spur track.

At that time there were six cars already on that track seven. The evidence is conflicting as to how close the nearest car was to the point where it was diverted from the lead. In that string of cars, already upon the spur track seven, there was a gap between those nearest the frog and two cars further down the track. The testimony is conflicting as to the width of that space, some of the evidence indicating that it was about four feet, and some indicating that it was ten or twelve feet.

The plaintiff's evidence tended to show that when car 7 was shoved onto track 7, it set in motion the string of cars already there and closed up that gap, and Martin, after attempting to couple the two cars so separated by handling the pin-lifter, went in between the cars for the purpose of effecting the coupling, and was crushed to death. His body was found after the crew had put another car or two upon the proper spurs. The evidence as to the manner in which Martin must have come to his death will be noticed below.

The cause was submitted to the jury upon the theory of plaintiff that the deceased was engaged in interstate commerce for the defendant at the time of his death, and that he made out a case against defendant for negligence in violation of the Safety Appliance Act. It appears from the briefs of both the appellant and the respondent that the only issues for determination turn upon the applicability of those two acts. Appellant makes three points in its brief: (1) That the deceased, at the time of his injury, was not within the scope of his employment, and his death was due to his own negligence in going between the cars, in violation of rules; (2) that he was not engaged in interstate commerce; (3) that there was no violation of the Safety Appliance Act.

I. Appellant contends squarely that the plaintiff is not entitled to recover because deceased was not acting within the scope of his duty at the time he was killed.

Respondent retorts that the defendant having pleaded assumption of risk thereby admits that the defendant was in the performance of his duties, because he could not assume any risk in the service of defendant which was not within the line of his duty. Respondent cites in support of that position the case of Grott v. Johnson, 2 S. W. (2d) 785, 1. c. 789. The appellant seeks to avoid the force of that ruling by pointing out a verbal difference in the plea of assumption of risk in the Grott case from that in this case, apparently upon the theory that the former was more general than the latter. The answer of defendant pleads that defense in these words:

"If plaintiff's deceased was killed at the time and place mentioned in plaintiff's said petition, his injury and death were caused by the

ordinary risks of the deceased's employment, which were by him at all times assumed.''

This seems to be general enough to cover the circumstances of Martin's death. There is no other condition mentioned in that answer except that he was killed at the *time and place* mentioned in the plaintiff's petition. In other words, if the plaintiff makes out a case at all, introduces proof to sustain the allegations of his petition regarding the death of Martin, Martin was assuming the risk. Then in that case he was in the line of his duty. Further it is admitted all through the argument and all through the appellant's analysis of the facts, that Martin was killed *at the time and place* mentioned in the petition; so, as said in the Grott v. Johnson case: ''It is fundamental that what is admitted by the pleading is unnecessary to be shown by the testimony.''

An allegation in the defendant's answer that the deceased at the time and place of his death assumed the risk incident to his employment necessarily implies that he was in line of his duty at that time and place.

As authority for saying that Martin was not in the line of his duty and that the pleading did not estop defendant from urging that point here, appellant cites Johnson v. Terminal Association, 8 S. W. (2d) 891. In that case the answer pleaded assumption of risk, but the question was not raised in the progress of the trial at all. The court simply held that the injury was caused by the plaintiff's act and the defendant was not negligent in any manner. Interstate commerce did not enter into the case, nor was the Safety Appliance Act involved.

Appellant makes the further point that the petition does not allege that the deceased was in fact engaged in the duties of his employment at the time. The petition alleges that the deceased ''as a member of a switching crew and performing his duties in connection with said employment and working in the scope thereof and under the orders and directions of the defendant and its superiors over said deceased, he was caught between two railroad cars.''

The appellant reiterates the proposition that the failure of the petition to allege some pertinent fact justifies a reversal. In that argument appellant overlooked the Statute of Jeofails, Section 1550, Revised Statutes 1919, which provides that a judgment shall not be reversed, among other things, ''for omitting any allegation or averment without proving which the triers of the issue ought not to have given such verdict.''

We are not at liberty to ignore the direct command of the statute. After the defendant has gone to trial and evidence introduced upon all the points controverted and the verdict rendered, it is too late then to assert that some fact supported by the evidence and authorizing the verdict is not alleged in the petition. Therefore, if the ver-

dict is supported by the evidence upon all contested points a failure of the petition to allege some matter necessary to sustain the verdict will not vitiate it.

II. Appellant further claims that the duties which Martin was performing for the defendant at the time were not in furtherance of interstate commerce.

The drag which was brought out of the Katy yards was brought around through the State of Missouri into the Kansas Transfer Yards, and a car was shunted off from that drag onto track number seven. That car, of course, was an interstate commerce car in performing that circuit, but that need not be considered in determining this question. It was not one of those between which Martin was crushed to death.

The cars between which he was killed were marked as "bad order" cars. The appellant bases its argument entirely upon the character of those two cars, regardless of the character of the other cars already on track 7. Appellant says:

"It appears without dispute that at least two of the cars, the two cars between which deceased was crushed and killed, were 'bad order' cars."

The inference from that appears to be that such cars would be sent to the proper repair shops on the Kansas side. Appellant cites in support of that position Illinois Central v. Behrens, 233 U. S. 473, where an emloyee, whose general employment was connected with interstate commerce, was at the time engaged with a switch engine in moving cars all loaded with intrastate freight, and was injured while so employed. It was held that he was not engaged in interstate commerce. The work he was doing at the time had no effect upon the furtherance of interstate commerce. But the court said (1. c. 477), that where an employee was injured in the course of the general work of a railroad company engaged in interstate and intrastate commerce, the carrier was liable for such injury "whether the particular service being performed at the time of the injury, isolatedly considered, was interstate or intrastate commerce."

Appellant also cites the case of Poindexter v. Cleveland, C. C. & St. Louis Railway Co., 319 Mo. 285, 4 S. W. (2d) 1065. In that case the defendant was engaged in both interstate and intrastate commerce, and the plaintiff at the time of his injury was engaged in repairing a coupler on an intrastate car. It was held that he was not engaged in interstate trade. Plaintiff was a repair man and not a part of the switching crew. The court said (1. c. 289):

"If Poindexter at the time of his injury had been making his rounds for the purpose of inspecting indiscriminately both interstate

and intrastate cars, he would unquestionably at that time have been employed in interstate commerce."

The doctrine is further elucidated in case of New York Central v. Carr, 238 U. S. 260. There two intrastate cars were backed on a siding from a train which had contained interstate cars. The Railroad Company claimed that the plaintiff Carr, who was a brakeman, while handling those two cars was engaged strictly in intrastate business. The court held that the brakeman was in the performance of interstate duty while setting the brake on an intrastate car to be attached to interstate train.

In considering the question we are not limited to particular cars which Martin was attempting to couple at the time he was killed. We must consider what was the relation of his work to the entire movement of the drag upon that spur track. Obviously his attempt to couple the two cars, if he did so attempt, was for a purpose affecting all the cars in the drag. The appellant admits in its brief: "The sole purpose of having cars standing on the spur tracks coupled together was to make future moves of the cars on the tracks more convenient."

That proposition is elaborated by the appellant at some length.

The appellant in its argument says several times that track seven was used for bad order cars and cars destined for St. Louis. On this point Stollard, the foreman of the switching crew, witness for the defendant, said:

"Q. You told Mr. Conrad here that those tracks were used for particular purposes, different tracks, what were you using No. 7 *for that day?* A. St. Louis and bad orders.

"Q. That means, aside from the bad orders, *that certain cars were loaded for St. Louis, Missouri, and were being put in on that track?* A. *Yes sir.*"

Paul Parks, witness for defendant, pin-puller in the crew, testified:

"Q. You were using that track 7 for bad orders and St. Louis yards *that day?* A. Yes, sir."

According to those two witnesses, track number seven was used *that day* for St. Louis cars, and the matter was not questioned at any time during the trial. The defendant made no effort to show that no St. Louis cars had been put upon that track or to refute the natural inference from this testimony. There were six cars already on that track and *that day* St. Louis cars were being put on it. Even conceding that it was not shown that any particular car then on the track was a St. Louis car, the fact that that particular track was used that day for St. Louis cars, indicates that the coupling of those cars together was necessary to facilitate that particular interstate commerce. The evidence was sufficient to submit that issue to the jury.

In La Lone v. St. Louis Merchants' Bridge Terminal Ry. Co., 316 Mo. 835, 293 S. W. 379, Division One of this court, in an opinion writ-

ten by Judge Atwood, summarized the holding in the several cases and gave the definitions of what constituted Interstate Commerce (1. c. 340), using this expression: "The work was interstate commerce if it constituted preparatory movements in aid of interstate transportation."

And quoted further from Kinzell v. Railway Co., 250 U. S. 1. c. 133: "The doing of work which has for its immediate purpose the furthering of the conduct of interstate commerce constitutes an employment in such commerce."

Spur track 7 was that day being used for St. Louis cars which possessed an interstate character and therefore since cars engaged in interstate commerce either were on or had to be brought on that track during the day, then to use the language of appellant, "the sole purpose of having cars standing on the spur tracks coupled together was to make future moves of the cars on the tracks more convenient." That is, any movement of the interstate cars to which that track was that day devoted would be promoted by such coupling.

III. The third point made by the appellants that a violation of the Safety Appliance Act in respect to the couplers, was not shown.

Parks, the witness for the defendant, testified that it was necessary for one desiring to couple cars on the track to stop the train by signal before he would step between the cars. That his duty was to lift the coupling-pin by a lever. If it failed to work that he should give a signal and stop the train before stepping between the cars. Parks said in his answer to a question:

"Q. Why are field men required to make those couplings whenever the cars are separate? A. So that when he wanted to pull the drag out to the transfer, that was the one track, or to take them to proper destination, they would be all together and you can pull them."

The effect of the testimony of this witness is that it was necessary to couple together the cars on the spur tracks.

Dudley, witness for plaintiff, testified that he stood where he could see the space on the north side of those cars between Stollard and Martin, and that Martin was within view of Stollard, the foreman. He saw Martin take hold of the pin-lifter and give it two or three jerks and then step out of his sight back between the cars. He said these cars which Martin was trying to couple were ten or twelve feet apart when he saw Martin come through from the south side, but they were about four feet apart when he stepped back between the cars. The witness was then asked if he saw him give a signal before he went between the cars. He answered that he did.

The defendant's counsel objected to this question on the ground that it was immaterial and not within the issues, evidently on the theory that contributory negligence was not an issue.

In C. R. I. & P. Ry. Co. v. Brown, 229 U. S. 1. c. 320, it was held that contributory negligence could not be assigned to one going between interstate cars to effect a coupling, and an employee of a carrier injured under circumstances like this does not assume the risk. The court said (1. c. 320-321):

"This court settled that the failure of a coupler to work at any time, sustains a charge of negligence in this respect, no matter how slight the pull on the coupling lever. And, further, 'The mere fact that the pin would not lift when plaintiff [Brown] endeavored to lift it makes a case of negligence under the first count.'"

In Foster v. Davis, 252 S. W. 433, this court held that the failure of the coupler to work was sufficient evidence that it was out of order. A like ruling was in Carter v. St. Louis T. & E. Railroad Co., 271 S. W. 358.

The appellant cites the case of Illinois State Trust Company v. Missouri Pacific Railway Company, 319 Mo. 608, 5 S. W. (2d) 368. In that case it was held that the failure of the safety appliance to act was not the proximate cause, but was the unexplained movement of a car that seemed to get adrift and drove some cars against the employee, causing his death. That was a fine point on the question of proximate cause. Here there was an attempted coupling in cars where a movement was being made in the usual manner; the alleged negligence of the defendant in moving these cars on track seven is eliminated, and the only question is whether there was a violation of the Safety Appliance Act.

IV. Appellant complains of Instruction 1, which covers the whole case, on the ground that it submitted a ground of recovery not embraced within the petition. An analysis of the complaint as argued shows that it does not mean that, but means only that some fact hypothesized in the instruction is not alleged in the petition. Complaint is made that the petition alleged that the coupler failed to work, whereas the matter was submitted to the jury on the ground that the coupler was defective. We think Instruction P-1, complained of in that respect, is not subject to that objection. It requires the jury to find that the coupler was defective and could not be operated by the deceased in such usual and customary way without the necessity of going between the cars. That is, it required the jury to find more than was necessary: both that it was defective and that it could not be operated without going between the cars.

V. Appellant complains of the witness Dudley; that the facts which he swore to were too incredible for belief, and makes a general

attack upon Dudley's credibility. Appellant overlooks the fact that its own witnesses did not agree upon several minor points. Dudley testified that he was formerly in the employ of the defendant; that at the time of the trial he was County Assessor of Wyandotte County, Kansas, having been elected to that position. His credibility was for the jury to determine.

VI. Appellant further complains that the instruction on the measure of damages is erroneous because based more or less upon the expectancy of defendant's widow. It was shown that Martin was twenty-seven years old at the time of his death, and his wife was twenty-three; that her expectancy was something less than thirty-nine years, and his expectancy was something over thirty-seven years. The instruction plainly is based on the life expectancy of Steve Martin, the shortest life, and this is the general rule.

It is further claimed that the verdict is excessive. Martin at the time was receiving one hundred and eighty dollars a month, and reserved twenty-five or thirty dollars to be spent upon himself, and remitted the rest to his family. He worked regularly. With his expectancy, his earning capacity, a man in good health, $28,000 does not seem to be excessive. [Oglesby v. St. L. & S. F. Ry. Co., 318 Mo. 79, 1 S. W. (2d) 1. c. 180; Porterfield v. Terminal Railroad Assn., 319 Mo. 619, 5 S. W. (2d) 1. c. 452.]

The judgment is affirmed. All concur.