**John Bartosik, Appellee, v. The Chicago River & Indiana Railroad Company, Appellant.**

**Gen. No. 35,417.**

Opinion filed March 28, 1932. Rehearing denied April 29, 1932.

SIDNEY C. MURRAY, MARVIN A. JERSILD and HAROLD E. CHRISTENSEN, for appellant.

JOSEPH D. RYAN, for appellee.

MR. JUSTICE MATCHETT delivered the opinion of the court.

In an action on the case under the Federal Employers' Liability Act, Cahill's St. ch. 114, ¶ 321 *et seq.*, at the close of all the evidence, defendant moved for an

instruction in its favor, which was denied. The cause was submitted to a jury which returned a verdict for plaintiff in the sum of $30,000, and the court, overruling motions for a new trial and in arrest, entered judgment which defendant seeks to reverse by this appeal.

The declaration was in three counts. The first count alleged in substance that defendant was a common carrier engaged in interstate commerce; that it maintained in the City of Chicago a yard in which were divers tracks, switches and leads used by defendant in switching and moving freight cars in interstate transportation; that it assembled cars in making up trains; that plaintiff was employed by defendant in such interstate commerce, his duty being to repair cars "so being assembled as aforesaid, and which said cars then and there contained merchandise" consigned to places outside of Illinois; that on April 23, 1929, while in the course of his employment, it became plaintiff's duty to make light repairs on cars being so assembled and which then and there contained commodities consigned to points outside of the State of Illinois; that defendant without notice or warning kicked, shunted or propelled other cars with great force and violence against the cars, one of which plaintiff was repairing, and that as a proximate result of the negligence, one or more of the cars came in contact with plaintiff and one of his legs was thereby so crushed and bruised that it became necessary to amputate it.

In the second count plaintiff averred that on April 23, 1929, defendant assembled a number of cars on a track; that these cars were destined to points outside of and beyond the State of Illinois; that it was the usual practice and custom of defendant to make light repairs on the cars so assembled in order that the cars and the train aforesaid, after it was made up, could be operated and moved in safety; that the coupler and the coupling appliances on one of these cars were then in

a state of disrepair and defective and it then and there became and was plaintiff's duty, in the due course of his employment, to repair the same; that plaintiff was also then ordered to do so by an agent of defendant; that prior to his engaging in the work of making these repairs another servant of defendant assured plaintiff that all of the cars comprising the train had been placed on the track; that while he was making the repairs as directed and in reliance upon this assurance went between the ends of the cars for the purpose of repairing the defective coupler, defendant carelessly and without notice and warning propelled certain other cars against the standing cars and upon and against the car upon which plaintiff was at work, injuring him.

The third count does not aver a case under the federal act.

The first contention of defendant is that plaintiff at the time he received his injury was not employed by defendant in interstate commerce, and that the instruction requested by defendant at the close of all the evidence should have been given for that reason. The point is controlling, and it will be unnecessary to discuss any other.

The material facts are practically uncontradicted and were for the greater part presented upon the trial by stipulation. They are as follows: Defendant is a common carrier by railroad, engaged in interstate commerce, and it owned, operated and controlled the yard and tracks in question situated in the City of Chicago, where plaintiff received his injury on April 23, 1929. Plaintiff had been employed by defendant for about six years as a safety appliance repairman in the "Texas" yard at 47th and Racine streets in Chicago. In this yard there were about 20 tracks running generally east and west. At each end were lead tracks connected therewith. Both empty and loaded cars destined to the various railroads entering Chicago were switched by

defendant in this yard, and there was assigned to each one of the railroads so served a track upon which the cars assigned to it from time to time were received. The accident happened upon track No. 5, which had been assigned to the Chicago, Burlington & Quincy Railroad Co. It was the custom to "kick" in these cars on the various tracks, but defendant made no effort to couple them together or to connect the air hose. Sometimes a cut of more than one car was "kicked" in and at such times the cars thus "kicked" in would be coupled together. Occasionally the cars thus "kicked" would move with a momentum sufficient to bring them in contact with cars already on the track, and sometimes in such cases these cars would be coupled automatically by the impact. These were the only instances in which couplings were made, and the cars as they stood on the tracks were often widely separated. It was the usual practice that about five o'clock in the evening the train crews from the various railroads thus served would come to the yard and wait on an adjoining track with locomotives and cabooses until defendant had completed its switching operations. When it was ascertained that the switching was finished or when three blasts of the whistle were blown by the locomotive doing the switching, these crews understood that they might come into their respective tracks and take away the cars which had been placed thereon for their particular company. Sometimes the engineer would desire to move his train backwards and a similar whistle signal would be given.

The testimony of the conductor for the Burlington was that he would rearrange the cars set out for him in such a way that the cars which were loaded would be placed at the front end of the train. This testimony was, however, denied by plaintiff, but the uncontradicted evidence shows that before the foreign crews

could move the cars out of the yard they had to move them together, couple them and connect the air hose.

There was an organization known as the Chicago Car Interchange Inspection Bureau which furnished car inspectors in the yard whose duty it was to inspect all the cars going to other railroads. If these inspectors found a defective car they placed on it a bad order card, which specified the particular defect. There were a number of car repairmen whose duties were similar to those of plaintiff. They moved around the yard and made repairs upon the particular cars located on these tracks. They were supposed to make only light repairs. If the defect was such as to require heavy repairs or if it was considered dangerous to make repairs on the particular track where the car stood, or if for any reason the repairs were not made the defective car was moved over to what was known as a rip track for repairs and might be held until the day following.

On this particular occasion, this Burlington car stood on track five. It had been carded as in "bad order." It needed a pin lifter hook in the coupler at the east end of the car. This car was empty. There were 27 cars on track five. Ten of these cars were loaded and were consigned to points outside the State. Six were loaded and consigned to points in Illinois. The rest of the cars were empty, and one of them was consigned to West Fargo, North Dakota. This empty Burlington car which plaintiff undertook to repair had been billed from St. Joseph Stock Yards, Missouri, on April 19, 1929, loaded with pelts and hides consigned to Armour & Company, Wool House Track, Union Stock Yards, Chicago. It arrived at its destination on April 23 and was unloaded. On the same day, without being billed, it was moved from Armour's wool house track and placed upon track five for delivery to the Burlington Railroad, the owner of the

car. It was inspected by the Chicago Car Interchange Bureau and found to be in bad order. The 27 cars on this track when assembled and made up were to have been moved from track five to Hawthorne yard at 26th street and Cicero avenue for further classification.

Plaintiff's testimony is to the effect that one of the inspectors told him that there was a car on track five which needed a pin lifter hook; that he went to his shanty to put away the tools he had been using and to obtain a hook; that he came back with the hook, saw the crew switch some cars and was then advised by an employee named Sullivan that they were through with switching; that three blasts of the whistle were blown and that he then went to work on the car; that he had to stand between the rails to make the repair; that the end of the car, which he was repairing, was not coupled to the next car but that there was a space of from four to six feet between it and the next car east of it; that he worked there from five to eight minutes when some more cars were switched on the track, causing his injury.

The number of this C. B. & Q. car was 16463, and it had been moved to the yard for the purpose of delivering it to the connecting carrier. It traveled under directions to be returned to its owner, after being unloaded and after repairs and inspection were made.

The question as to whether at a given time and as a matter of law a plaintiff and a defendant are or are not engaged in transportation of interstate commerce within the meaning of the Federal Employers' Liability Act is sometimes difficult to answer. The question in the last instance is for the federal courts deriving their jurisdiction from the sovereignty by which the Federal Employers' Liability Act was enacted. They have been requested to declare a standard invariable by circumstances or free from confusion in

application. They have declined so to do, saying (*Industrial Accident Commission v. Davis,* 259 U. S. 182):

"If that were ever possible, it is not so now. Besides, things do not have to be in broad contrast to have different practical and legal consequences. Actions take estimation from degrees and of this, life and law are replete with examples." In *Shanks v. Delaware, L. & W. R. Co.,* 239 U. S. 556, the Supreme Court of the United States stated the rule as follows: "The true test of employment in such commerce in the sense intended is, Was the employee at the time of the injury engaged in interstate transportation or in work so closely related to it as to be practically a part of it?" To that statement of the law the federal courts consistently adhere, as indicated by the opinion in the case of *Chicago & Northwestern Ry. Co. v. Bolle,* 284 U. S. 74, 52 Sup. Ct. 59.

Defendant contends that under the ruling announced in *Foreman Trust & Savings Bank v. Grand Trunk W. Ry. Co.,* 242 Ill. App. 428, in which case certiorari was denied by the Supreme Court of the United States, 279 U. S. 839, it must be held as a matter of law that plaintiff here was not engaged in interstate commerce at the time he received his injuries. It must be conceded that the facts which appeared in that case are quite similar to those which appear here. The plaintiff's intestate there was employed by the defendant carrier as a light car inspector, and while in the course of his employment in making repairs on an empty freight car standing on what was known as "long" or "C" track of defendant's yard, he was injured by a train of cars moved backward by an engine under the control of defendant's employees. The car upon which plaintiff was working had on that day been used to bring an interstate shipment of meat to the Union Stock Yards, Chicago, and the shipment after its arrival was unloaded at defendant's freight house. At the freight

house the intestate inspected the car and put a bad order card on it. On the same day this car was moved by defendant from the long track and hauled out to what was known as the Elsdon yards, belonging to defendant, and this train carried freight and merchandise which were in transportation by defendant to points outside the State of Illinois. The train contained both interstate and intrastate cars, and it was being made up on the long track at the time the accident occurred. The evidence showed that the car was in such condition at the time of its arrival that it could not be safely removed in a train, and there was other evidence tending to show that the situation was such that the further movements of the car were unsafe unless it was repaired. The custom was to make light repairs only at Twelfth street so that the cars might be moved to the Elsdon yards at 51st street, where the general repair work was done. The car was dropped off at the Elsdon Yards, and there was no evidence indicating its next movement or tending to show what the intention of the defendant was with reference to its use after the interstate shipment of meat was unloaded at defendant's freight house at Twelfth street. After reviewing the authorities, most of which are cited in this case, we said:

"From this review of the decisions, we are persuaded the evidence in this case fails to make prima facie proof of a case for plaintiff under the statute. When the interstate shipment of meat was unloaded at Twelfth street, so far as the evidence here discloses, the interstate movement of the car ceased. Other movements, first to the track and later to the yards for repair, were presumptively intrastate movements, and there is no evidence from which a jury could reasonably find that such movements were other than intrastate movements. In fact, there is not a scintilla of evidence in the record showing that the movements of

the car, first to the track and afterwards to the yards, were in connection with any interstate purpose. The plaintiff cannot establish her case by a guess.''

Plaintiff says that there is a significant distinction between the *Foreman* case and the one before us; that in the *Foreman* case the movement of the car on which the plaintiff was working had ceased, the car had been placed on a track for the express purpose of repairing it, and not for any other purpose connected with transportation, that there was no evidence to show what its next movement would have been, and it did not form a part of any train, nor was it being assembled into a train; that here the car being repaired was standing coupled to others of a train on a track awaiting the arrival of an engine which would haul the entire train out, the repair of the car being only an incident to the general purpose of the movement. He further says that while in the *Foreman* case the car was not on a definite assignment, in the present case the car was assigned to and formed a part of the train which was about to move in interstate transportation; that the status of the train being assembled was entirely interstate, not only as to those portions of it which were themselves employed in interstate transportation; that its status was definitely fixed as an interstate train even as to those portions which may not have moved out of the State at all; that as it was established that the movement of the train out of the yard which was scheduled to occur shortly after the time plaintiff was injured (the engine assigned to make the haul being then in waiting just outside the yard) was interstate in character, the only question for determination is as to the relation the car in question bore to this interstate movement. Plaintiff further says that many decisions have held that instrumentalities of interstate transportation, when uncoupled from a train and well removed from it, retained their interstate character

when intended to be used in such commerce, and he cites in support of these contentions *North Carolina R. Co. v. Zachary,* 232 U. S. 248; *Chicago & Northwestern Ry. Co. v. Bower,* 241 U. S. 470, and Roberts' Federal Liabilities of Carriers (2d ed.), vol. 2, sec. 742, p. 1416.

As the reply brief of defendant points out, not one of the cases cited by plaintiff relates to the status of a car repairman, but all of them concern only trainmen. The distinction has been recognized in Roberts' Federal Liability of Carriers (2d ed.), vol. 2, sec. 743, p. 1465, where the author states that the status of a repairman "depends upon the use being made of the instrumentality he is repairing at the time of the injury." Moreover, the *Foreman* case is not distinguishable in respect of the matters which plaintiff points out. There, as here, the plaintiff was making light repairs on a car standing on a track in defendant's yard. There, as here, he was injured by reason of a train thrown against other cars standing upon the same track. There, as here, the car had moved in interstate commerce and its shipment had been unloaded. There, as here, the car would ordinarily move out with other cars and be hauled to another yard within the State and in a train of cars which carried intrastate, as well as interstate, shipments. There, as here, this train was being made up on the track on which the plaintiff was injured; and there, as here, there was no further evidence as to what the next movement of the car would be. The statement in the opinion of the *Foreman* case that there was no further evidence indicating the next movement of the car refers, of course, to the movement next made after reaching the yards in which permanent repairs were to be made. The contention was made there, as here, that the plaintiff was engaged in transportation of interstate commerce because he was repairing the car which had been definitely as-

signed to move out of the yard in an interstate train and had been placed on a track coupled with other cars about to move as a unit in this interstate train. In the argument of plaintiffs in both cases there is the assumption that the cars which stood on the track constituted an interstate train in being. But in neither case was such train in being at that time. A movement by transportation in interstate commerce would be necessary and a condition precedent to that result. The train was not yet made up. The interstate movement of the car in both cases ended with the delivery of the freight carried in the interstate movement. The "bad order" card had the effect of definitely withdrawing the car from any such movement even had it not been ended, and it could not again move in interstate commerce until the repairs were made and the car again inspected for use. Repairs and inspection would both be necessary before the car upon which plaintiff's labor was being performed would become a part of the train about to come into being. Whether the car would be repaired in time to become a part of that train was uncertain and problematic. If the repairs were not made in time the car would have been left behind and removed to a repair track.

Plaintiff next contends that he was at the time in question engaged in interstate commerce because the work in which he was engaged was necessary to enable interstate cars on the track to be reached and moved. He says that the controlling purpose of the movement was interstate transportation to which his work was a necessary and preliminary incident. He points out that at the time he was injured track five contained 27 cars. The car on which he was working was the fourth or fifth car from the west end of the track; that of the cars on the track, 10 were loaded and consigned to points outside of the State of Illinois, so that out of the 27 cars not less than 11 were actually engaged in inter-

state transportation; that since there were 11 such cars on the track and not more than four at the most were west of the car on which plaintiff was working, it was obvious that at least seven interstate cars lay to the east of where he worked; that it was therefore apparent that when the engine would come in to move this cut of cars from the west, in order to move the cars to the east, it was necessary to move the car on which plaintiff was working; that in order to move the interstate cars lying to the east, the car in which plaintiff was working was required to be coupled to the car immediately to the east of it, and that it was therefore clearly established that the next movement on the track was to be one clearly interstate in character; i. e., the movement of the entire train. He says that it is clear from the evidence that had this movement been attempted without making the repairs to the coupler, one of two things must have happened—either the car would not have been coupled to the cars east of it, and thereby the intended movement of the interstate cars would have been impossible, or if it could have been coupled and the interstate cars thereby moved, such movement would have been a violation of the Federal Safety Appliance Act and would have rendered the carrier liable to a penalty therefor. It is therefore clear, plaintiffs says, that the repair in question had to be made in order to move the interstate cars in the manner contemplated by defendant; and it follows, he says, that any work being done on this car in order to place it in condition to be moved, was work so closely connected with interstate transportation as to be practically a part thereof. He cites in support of this argument *Pennsylvania Co. v. Donat,* 239 U. S. 50; *New York C. & H. R. R. Co. v. Carr,* 238 U. S. 260; *Southern Ry. Co. v. Jacobs,* 116 Va. 189, 81 S. E. 99, affirmed in 241 U. S. 229; *Louisville & Nashville R. Co. v. Parker,* 242 U. S. 13; *Seaboard Air Line Ry. v.*

*Koennecke,* 239 U. S. 352; *Southern Ry. Co. v. Puckett,* 244 U. S. 571; *Poindexter v. Cleveland, C., C. & St. L. Ry. Co.,* 319 Mo. 285.

Plaintiff also says that in this respect this case is distinguished and differentiated from the *Foreman* case, but he is mistaken in this regard, since there was express evidence there that the repairs made were necessary for the next movement of the train being made up. Practically all of the cases cited were reviewed in the *Foreman* case, and it will be unnecessary to repeat here what was said there. That case reached the highest national court and certiorari was denied. We are aware that does not mean that the court approved of the opinion, *United States v. Carver,* 260 U. S. 482, but it does mean that the decision in the *Foreman* case was approved and we know of no reason why a different decision should be reached upon a state of facts which cannot be distinguished upon any material point.

Plaintiff further contends that he was engaged in interstate commerce while making these repairs because the car in question had not yet arrived at its destination at the time of the accident. He points out that the evidence shows that it was specifically routed from St. Joseph, Missouri, to Chicago and thence to the connecting carrier, and says that as delivery to the connecting carrier had not been made, the interstate movement had not in fact ended. *Trowbridge v. Kansas City & W. B. Ry. Co.* (Mo. App.), 179 S. W. 777, is cited, and it must be conceded in this respect that the facts here are distinguishable from those which appeared in the *Foreman* case. The supposed facts upon which this contention is based are not undisputed on the record. One of the witnesses who did not see the car until two days after the accident stated, "It had the pool marks, same information as a home route car," and that this mark was "5/21" and "in-

forms you that it came from the C. B. & Q. on the 21st and it would move back to the C. B. & Q. road." This witness also stated:

"When these foreign cars came in with loads and are being returned empty, there is a small information home route card placed on the car on the inbound movement of the car as well as a pool mark, placed by the inbound inspector, showing the road and the date it came from that road. All foreign equipment travels on home route cards." This witness also testified in substance that there were a number of loaded cars whose return to the connecting carrier was compulsory "if the empty car was not reloaded and diverted out on a new original bill of lading," and in response to a hypothetical question he said that a car which had a home route ticket "had to move back to the delivery road, empty, unless it was reloaded and a new bill of lading originated on it." Under the car service rules which were introduced in evidence, it appeared that this particular car might have been returned either empty or loaded. The evidence shows that it had a "home route card" or pool mark "5/21" which was apparently placed on it on the 21st, two days after it was first billed from Missouri and began its interstate trip and not upon the day on which it was unloaded, which was the 23rd. At the most, as defendant contends, this pool mark was nothing more than a conditional direction that if after it was unloaded the car was not used or needed for another shipment its next trip would be to its owner, but that trip, if it was ever made, would be begun after the first one was ended.

This case is distinguishable on the facts from the *Trowbridge* case where the plaintiff was injured while switching a car in Kansas preparatory to its return to the Missouri Pacific Railroad at Dodson, Missouri, the Missouri Pacific Railroad having at that time given orders at Dodson that all box cars should be sent west

to a point in Kansas to be loaded with wheat. The opinion of the court in that case expressly stated that the court did not need to go so far as to hold that the mere return of the car to Dodson was a part of its incoming trip because of this direction by the Missouri Pacific road that all box cars returned to Dodson should be sent to their distribution point at Osawatomie, Kansas, to be used in the transportation of wheat. The contention that the effect of ''home route'' cards is to continue an interstate movement which otherwise would be ended, has been considered and expressly denied in *Rogers v. Canadian Nat. Ry. Co.,* 246 Mich. 399, 224 N. W. 429, in which certiorari was denied in 280 U. S. 554. The opinion of the court there said:

''To bring the empty cars again into interstate commerce service, the burden rested upon plaintiff to show that, at the time of the accident, they had commenced predetermined interstate movement. . . . The 'home route' card, accompanying cars bringing freight into this State, acts as a guide for the return thereof to the owning road, but does not predetermine their use and movement after delivery to the consignee and their unloading.'' To the same effect is *Wise v. Lehigh Valley R. Co.,* 43 F. (2d) 692. The concurring opinion of the presiding justice in the *Foreman* case stated:

''The unloading of the interstate freight terminated the interstate character of the car, and in the absence of any proof as to whether its next movement would be interstate or intrastate, the legal presumption that it would be intrastate prevails. Any other rule would lead to confusion.'' Here the contemplated movement of this empty car from the yard of defendant to that of the owner was intrastate.

After oral argument and after this opinion was prepared, plaintiff by leave cited additional authorities (*Gaines v. Detroit, G. H. & M. Ry. Co.,* 181 Mich. 376,

148 N. W. 397; *Northern Pac. Ry. Co. v. Maerkl,* 198 Fed. 1; *Sterner v. Michigan Cent. R. Co.,* 231 Mich. 382, 204 N. W. 102; *Stottle v. Chicago, R. I. & P. R. Co.,* 321 Mo. 1190, 18 S. W. (2d) 433), and it is urged that this last case modifies the *Poindexter* case cited in the opinion. It is true that that case distinguishes the *Poindexter* case, but on the ground that "Plaintiff (Poindexter) was a repairman and not a part of the switching crew." We have given consideration to all these cases as well as to *Gidley v. Chicago Short Line Ry. Co.,* 346 Ill. 122, a recent opinion by the Supreme Court of our State. We do not find anything in these cases which would change our conclusion.

In 2 Roberts' Federal Liability of Carriers (2d ed.), sec. 765, p. 1469, the author says:

"For many years after the enactment of the Federal Employers' Liability Act, the interstate character of such employees in repairing engines and cars used indiscriminately in moving both interstate and intrastate traffic was not passed upon by the national Supreme Court. Many State and federal courts had held that an employee repairing a car or an engine, even while not being used in transportation, and set aside for repairs or preparation for another trip, was engaged in interstate commerce if the engine or car, being repaired was in fact, when 'on the road,' used indiscriminately in both interstate and intrastate commerce. But, under a controlling decision of the national Supreme Court rendered in 1917 (*Minneapolis & St. L. R. Co. v. Winters,* 242 U. S. 353), the rule adopted by these courts to determine interstate employment of car and engine repairers, was too broad; for the court in the *Winters* case held that an employee repairing an engine when not used in pulling trains, is not within the purview of the federal statute unless the engine being repaired is exclusively devoted and assigned to the movement of interstate traffic. The

same principle would necessarily apply to car repairers.'' *Northern Pac. Ry. Co. v. Maerkl,* 198 Fed. 1, is cited by the author, vol. 2, p. 1469, as a case which announces an incorrect rule of law. *Sterner v. Michigan Cent. R. Co., supra,* seems to have been decided after the *Winters* case, and relying upon *Erie R. Co. v. Collins,* 253 U. S. 77, and *Erie R. Co. v. Szary,* 253 U. S. 86, which have been definitely overruled by the U. S. Supreme Court in *Chicago & Eastern I. R. Co. v. Industrial Commission,* 284 U. S. 296, where the court reaffirmed the test laid down in *Shanks v. Delaware L. & W. R. Co.,* 239 U. S. 556, and *Chicago & Northwestern Ry. Co. v. Bolle,* 284 U. S. 74, 52 Sup. Ct. 59. The *Sterner* case seems to be in direct conflict with *New York, N. H. & H. R. Co. v. Bezue,* 284 U. S. 415, 52 Sup. Ct. 205.

In *Chicago & Northwestern Ry. Co. v. Bolle, supra,* the opinion of the court, elucidating the test as theretofore defined in the *Shanks* case, said:

''It will be observed that the word used in defining the test is 'transportation,' not the word 'commerce.' The two words were not regarded as interchangeable, but as conveying different meanings. Commerce covers the whole field of which transportation is only a part; and the word of narrower signification was chosen understandingly and deliberately as the appropriate term. The business of a railroad is not to carry on commerce generally. It is engaged in the transportation of persons and things in commerce; and hence the test of whether an employee at the time of his injury is engaged in interstate commerce, within the meaning of the act, naturally must be whether he was engaged in interstate transportation, or in work so closely related to such transportation as to be practically a part of it.''

The more recent opinions of the Supreme Court as cited indicate an intention to adhere to this definition,

and to this definition of the national Supreme Court this court is, of course, bound to adhere in the construction of this statute.

Our conclusion is that on the uncontradicted evidence and as a matter of law the plaintiff in this case was not engaged in interstate transportation at the time he received the injuries for which he sues, and that his remedy is not under that law. The judgment of the trial court is therefore reversed with a finding of fact and judgment here for defendant.

*Reversed with finding of fact and judgment here for defendant.*

O'CONNOR, P. J., and McSURELY, J., concur.

Finding of fact: We find as a fact that plaintiff and defendant at the time plaintiff received the injuries for which he sues were not engaged in interstate transportation within the meaning of the Federal Employers' Liability Act.