JENNIE MAY TRUESDALE, Administratrix of the Estate of WILLIAM MAY, v. WILLIAM WHEELOCK and WILLIAM G. BIERD, Receivers of the CHICAGO & ALTON RAILROAD COMPANY, a Corporation, Appellants.—74 S. W. (2d) 585.

Division One, September 18, 1934.*

*NOTE: Opinion filed at May Term, 1934, June 12, 1934; motion for rehearing filed; motion overruled July 17, 1934; motion to transfer to Court en Banc filed; motion overruled at September Term, September 18, 1934.

*Jones, Hocker, Sullivan, Gladney & Reeder* and *Wm. O. Reeder* for appellants; *Silas H. Strawn* of counsel.

*N. Murry Edwards* and *Robert A. Harris* for respondent.

HYDE, C.—This case, coming recently to the writer, is an action under the Federal Safety Appliance Act (U. S. C. A., Title 45, secs. 1-16 and 51-59) brought by the administratrix of the estate of William May, deceased, for damages for his death while employed by defendants as a switchman. It was submitted solely upon a violation of Section 2 of the act with reference to couplers. Plaintiff had a verdict for $35,000. Defendants appealed from the judgment entered thereon.

May was killed while engaged in a switching operation at Wood River, Illinois. The yard there was used by both the Chicago & Alton and the Big Four. There was a lead track north and south through the yard. From this lead track, there were switch tracks, called classification tracks, numbered from 1 to 8 beginning at the north, upon which cars were placed for making up trains. The tracks ran gradually downgrade toward the south. The yard office was on the east side of the lead track. May was a member of a Chicago & Alton switching crew which in the movement, in progress when he was killed, was attempting to switch a car onto track No. 7. The switch engine, coupled to six cars, was backing south on the lead track. There was a Big Four switch engine, coupled to a string of 20 to 25 cars on track No. 4, waiting to back out onto the lead and go out of the yard when the Chicago & Alton cleared the lead. The Chicago & Alton crew consisted of Plumb, engineer, Smith, fireman, Garvey, foreman, May and O'Neill, switchmen. O'Neill went to track No. 7, to throw the switch. It was a dark night and he did not see what took place. Neither did Smith, who was on the left side of the engine.

Only the end car, a tank car referred to as the S. T. C. X. car, was to be switched onto track No. 7. The second car from the south end was also a tank car, R. P. X. 517. It was moving in interstate transportation. The coupler on the south end of this car was in bad condition. The defect was that the pin could not be pulled by operating

the lever at the side of the car, because the pin had been jammed and had dropped out of the slot in which it worked. This was a defect which could not be seen by inspection from the outside, but it was discovered after the accident, the car bad-ordered for that defect, and taken to the rip track where this coupler was removed and replaced. Combs, a Chicago & Alton inspector, was with the switching crew looking over the cars they had brought into the yard. May was acting as pin puller; Garvey giving lantern signals for all movements. May also carried a lantern. The east side of the cars was the working side for the movement because the engineer was on that side. Three members of the Big Four crew, Laughlin, Woodyard and Mueller were on the east side of the lead, waiting for the Chicago & Alton to get out of their way, and were following its movement. The Chicago & Alton switch engine was backing south on the lead. May, at the northeast corner of the S. T. C. X. car, was to pull pin with the lever when Garvey gave a kick signal. Upon this signal, the engineer would accelerate the motion of the train; then, if the pin was pulled, the foreman would signal for the other cars to be stopped and the end car would roll down the track of its own momentum. Garvey gave the kick signal, the train moved faster, and May attempted to pull the pin with the lever but could not do so. When the cars were stopped, Garvey told May to go to the other side. May did so, Garvey gave another kick signal and an attempt was made by May to pull the pin with the lever on the southwest corner of the R. P. X. car, which likewise failed to uncouple the car. The couplers of each car work independently of each other so that if the pin can be pulled from either one, the knuckle of that one will open and allow the cars to separate, although the knuckle of the other remains closed.

When the cars stopped after this second attempt, the south end of the R. P. X. car and the north end of the S. T. C. X. car stood near track No. 4. Both Garvey and May then went between the two cars, while they were standing still. Garvey was on the east side of the coupler working on it with both hands and May on the west side holding his lantern over it for Garvey to see it. Combs, Laughlin, Woodyard and Mueller were all standing where they could see both men between the cars. They do not agree upon just what happened thereafter. The testimony of Laughlin and Woodyard on behalf of plaintiff, was that Garvey and May were each working on his pin (Garvey on the S. T. C. X. and May on the R. P. X.) when "they decided they would have to have slack on the drawbars to pull the pin," and Garvey gave a slow back-up signal. The cars moved back about half as fast as a man could walk. Both Garvey and May walked along between the cars until this movement let out the slack so that there was no tension on the coupler pins; then Garvey "from the middle of the track" raised the pin with his hands while between

the cars. Garvey told May he had his pin. At this time May was still on the ground between the rails between the ends of the moving cars. When Garvey stepped out he gave a kick signal. At the same time Combs gave a stop signal. There was a lull or slowing down of the cars and the S. T. C. X. car immediately separated from the R. P. X. car a few feet. Combs said to Garvey, "I guess that is my fault that they parted; I gave a stop signal." Garvey then gave a second kick signal and the cars came together with sufficient force to roll the S. T. C. X. car on track No. 7. The time between the two kick signals was estimated at four or five seconds apart. It was also estimated by these witnesses that the cars rolled six or eight feet before they came together the second time; and that when Garvey gave the final stop signal these cars were eight or ten feet south of where he stood. When the cars came together upon the last kick signal no metallic sound was heard as is usually the case upon such a movement. Immediately after the kick, the cars were stopped by Garvey who then gave a signal to move ahead. When the cars pulled away and the Big Four engine started to move out May's body was found between the rails of the lead track between No. 6 switch and No. 7 switch. He was injured in such a way as to show that he had been crushed between the couplers. Ravelings from his clothing were found on the knuckle of the coupler of the R. P. X. car. It was also shown that, after the cars were uncoupled and separated, the knuckle of one would be open and that it was necessary to close it or they would be likely to couple if they came together again. It was also shown that the only way to close the knuckle would be to take hold of it and push it over.

Laughlin testified that he "saw everything up to the last time the kick signal was given;" that "at the time the second kick signal was given" he saw May "in between these cars;" that he was "between the rails . . . right by the coupler;" and that when that signal was given the R. P. X. car moved beyond him and cut off his view of May; and that he never saw May "on the outside on the west side of the cut of cars out from in between the ends." Woodyard testified that the last time he saw May was just after Garvey stepped out and gave the first kick-signal; that he was between the cars; and that just before the cars moved beyond him and cut off his view of May "he made a short step back, looked like preparing to get out. . . . He was stepping to the west," but that he never saw him on the outside. He said that when Garvey gave the second kick signal he could not see between the cars.

Garvey's testimony was that he and May were only between the cars while they were standing still; that he examined the couplers while May held his lantern to throw light there; that he found the S. T. C. X. coupler chain kinked, hit it with his hand and took the kink out; that before the train was moved again they both stepped

out in the clear; and that he was on the east side and May on the west side. His account was further, as follows:

"And I told Bill, 'Now, Bill, get out from there now and we will find out if I can pull the pin now.' In order to pull the pin I would have to back the engineer up. While the cars were standing still the slack of the cars is all stretched out and you cannot release or pull a pin until the slack is up to make it loose, and I backed the engineer up in a slow fashion, like this (indicating), and I pulled the pin and I says, 'Bill, get away from here, I can pull the pin, I got it.' And after I determined the pin could be pulled I gave the engineer a kick signal. . . . He was in the clear of the cars before any effort was made to back up, any effort whatever was made to back up, when we moved the cars in any fashion, the man was in the clear of the cars. That is my duty to know that. . . . I knew he was over there and told him to stay over there, and at that time I gave a kick signal; there was a lull in the cars. I can't honestly say what caused it, what was responsible for it, whether the impact of the cars, the engine coming back against the cars, the cars released and the south car got away from the other five cars and I watched the movement of the car and I seen after watching it that the car under its own momentum was not going to go far enough, or as far as I had wanted it to go or intended it to go, without giving the car any more of a momentum; in other words, without pushing the car any more, and I immediately gave the engineer a stop sign . . . to the best of my knowledge the cars never came together" (again).

Garvey said he, likewise, heard no metallic sound after the kick signal and further stated that this "indicated the fact they didn't come together to me;" that he "gave a back-up signal immediately following with a kick signal; at that moment the car released and rolled away three or four feet;" that "the cars rolled approximately a car or car and a half length before they did stop;" and that to the best of his knowledge they never did come together after they separated. He stated he pulled the pin from the outside with the lever of the S. T. C. X. car; that May had no further duties to perform on the west side of the train; and that it was his next duty to come to the opposite side of the train; but that it was against the rules to come between moving cars to get there.

The engineer related his version of the signals after the men went between the cars as follows:

"After they determined what was wrong why I got another signal to back up and I started back and he gave me a signal; it wasn't exactly a kick signal, it was a signal to back up slowly in order to get the slack so they could pull the pin and I did that, and just then I got a stop signal and before the train had come to a stop I got a signal to come back a little more, a signal indicating he wanted to give it a little boost, and after that I got a stop signal."

Mueller, who testified as a witness for defendants, said that when the cars came to a stop, after May's unsuccessful attempts to pull the pin, they remained standing still all the time May and Garvey were between them working on the pin; that Garvey finally got the pin loose and said, "I got mine Bill;" that Garvey then stepped out on the east and May stepped the opposite way to the clear; and that Garvey then gave a kick signal. He said: "They were just starting to roll, and from some unknown cause to me there was a lull in the train. Naturally, the pin being up on this car it started to roll down a little, and Mr. Garvey said, 'That is right, damn it, knock the pin down,' meaning to the engineer. Of course, the engineer couldn't hear it from the distance he was. And he gave another signal to give this car the desired momentum to get it to go where they wanted it to, and he come back. . . . By the term 'lull' I did not mean the head end stopped; I said the head end lulled; a lull is a slowing of speed; it did not get time to stop until the second kick signal was given, and before it stopped the engineer come again with the engine and he got possibly a two or three foot gap between the cars, the car cut off, and the engine come from the head end, coming on the second kick signal, and that closed the gap; the head end was not stopped still after the kick signal was given, only it slowed to a lull between the cars until the succeeding signal called it to action; action was taken and the cars come together and the required amount of speed was put on the train and another stop signal was given and he stopped again; the south car proceeded down the yard, as he desired it, and the head end stopped; there was no stopping between the first and second signal; there was only a lull, and I will say they rolled probably twenty feet before the action of the second signal overtook the action of the first one."

Combs, the car inspector, likewise, said that the cars were standing still while Garvey was working between them and when he pulled the pin. He said, however, that he never saw May between the cars but that May was "just across on the other side about flush with the outer edge of the car" when Garvey, having taken a kink out of the chain on the S. T. C. X. car, stepped out and pulled the pin from the coupler of that car from the outside by using the lever on that car; that Garvey was only between the cars about ten seconds; that Garvey then said " 'I have got this one, lookout,' and with that Mr. May stepped back possibly two feet from the car" where he was in the clear of the cars. He said that Garvey then gave a slow back-up and that "when slack was given the rear car drifted away from the R. P. X. . . . Possibly four feet." He said that Garvey then gave a kick signal. He estimated that after the first back-up signal the cars only backed up two or three feet before there was hesitation in cars and the rear car drifted away, but that the cars moved to the south a car length and a half before they came together

again after the kick signal. He denied that he gave a stop signal. He also said that he examined the cars after the accident and found the knuckle on the R. P. X. car closed but that the knuckle on the S. T. C. X. car was open. He gave the direction to bad order the R. P. X. car because the pin lifter would not lift the pin. He said that there was nothing wrong with the coupler of the S. T. C. X. car.

The case was submitted upon plaintiff's main instruction, authorizing a verdict, which required that the jury find among other things, including the defective condition of the coupler (leaving out the words "if you so find"), as follows:

"That said William May on account thereof, in the line of his duties as a switchman for the defendants, went in between the ends of said railroad cars, for the ·purpose of adjusting and making operative or attempting to adjust or make operative said broken and defective and unoperative pin lifter, coupler, coupling lever and coupling pin; and that while William May was in between the ends of said cars adjusting, making operative and attempting to adjust and make operative said pin lifter, coupling pin, coupling lever and coupler, said string of cars were moved on signal from another member of said switching or engine crew; and that as a direct result thereof, said William May was injured."

Defendants' theory was submitted in two following instructions:

"2. The court instructs the jury that if you find from the evidence in this case that after the car mentioned in the evidence had been uncoupled (if you find it was uncoupled) the deceased, William May, was then on the west side and in the clear of the cars, and that thereafter the deceased, William May, went between two cars while the same were moving and was caught by the cars and injured, then and in that event the court instructs you that the plaintiff cannot recover in this case and your verdict must be for the defendant.

"3. The court instructs the jury that even though you may find and believe from the evidence in this case that the coupler or couplers mentioned in the evidence were defective, yet if you further find and believe from the evidence that when the car mentioned in the evidence was uncoupled, if you find it was uncoupled, William May, the deceased, stepped from between the cars and into the clear and was not injured at that time, then the court instructs you that the plaintiff cannot recover in this case and your verdict must be for the defendants."

Defendants contend that their demurrer to the evidence should have been sustained because the evidence conclusively shows that the defective coupler was not the proximate cause of the injuries resulting in May's death. They also contend that for the same reason there was no evidence upon which to base plaintiff's Instruction No. 1. Defendants base their argument upon their theory of the evidence, which is that May was absolutely in the clear after

the cars were uncoupled; that, therefore, the coupler ceased to have any causal connection with what thereafter happened; and that the sole cause of May's injuries, sustained in getting caught between the drawbars, was his own negligent act of attempting to cross back to the east side of the cars by going between them, after they had separated, while they were still moving, and after the uncoupling movement had been completed. It may be conceded that if the evidence conclusively shows that, after the cars were uncoupled, May was absolutely in the clear in a place of safety and went back between the cars, merely to get on the other side and not for any purpose connected with uncoupling them, then the defective condition of the coupler would not be the proximate cause of his death. The cases cited by defendants sustain this proposition. [Peters v. Wabash Railroad Co., 328 Mo. 924, 42 S. W. (2d) 588; Davis v. Hand, 290 Fed. 73; Illinois State Trust Co. v. Missouri Pacific Railroad Co., 319 Mo. 608, 5 S. W. (2d) 368; Martin v. St. Louis-San Francisco Railroad Co., 323 Mo. 450, 19 S. W. (2d) 470; see, also, 329 Mo. 729, 46 S. W. (2d) 149; McCalmont v. Penn. Railroad Co., 283 Fed. 736.] We discussed some of these cases in Alcorn v. Missouri Pacific Railroad Co., 333 Mo. 828, 63 S. W. (2d) 55, where it was likewise contended that a defective coupler was not the proximate cause of the injury. [See, also, Williamson v. St. Louis-San Francisco Railroad Co., 335 Mo. 917, 74 S. W. (2d) 583.]

If, however, the evidence does not conclusively show that May got from between the ends of the cars and in the clear before being caught between the drawbars, and if there is substantial evidence from which the jury might find that he had never been out from between the ends of the cars but was caught either on his way out or while still doing something in connection with the uncoupling movement, then the court was correct in ruling defendants' demurrer to the evidence and the case was properly submitted. This would be true even though May had a safe way of getting out, but instead of taking it, negligently attempted to go out by an unsafe way, namely, to the east between the separated drawbars, rather than to the west where he could not have been caught between them, because taking an unsafe way out could only be contributory negligence or assumption of risk, neither of which is a defense to a violation of the Safety Appliance Act. [Title 45 U. S. C. A., sec. 7 and secs. 53 and 54; Alcorn v. Mo. Pac. Railroad Co., 333 Mo. 828, 63 S. W. (2d) 55, and cases cited, certiorari denied (U. S.) 54 Sup. Ct. 228, 78 L. Ed. 252.]

In this case there can be no doubt that the defective coupler was the cause of May's going between the cars. It did not cease to operate as the proximate cause of his being between the cars until he got out or had a reasonable time to get out, and would be the proximate cause of any injuries he received during such time. Therefore, if there is substantial evidence in this case that he did not get out, but was injured

on his way out, then there was a case for the jury. There was a sharply disputed issue of fact between the witnesses for plaintiff and witnesses for defendants on one matter which is vital in determining this question. Defendants' evidence was that *neither May nor Garvey were between the cars while they were moving;* that they made all their examination and adjustment while the cars were standing still; that both of them stepped out in the clear before the cars were moved; and that the pin was pulled by Garvey's using the lever from the outside. Two of defendants' witnesses even say that the pin was pulled before the cars were moved, while two others say that the cars were backed slowly to let out the slack before the pin was pulled, but they all agree that, regardless of when the pin was pulled, May and Garvey were both outside of the ends of the cars before the cars were moved. Plaintiff's witnesses, on the other hand, both positively testified that both May and Garvey walked along, between the rails and between the ends of the cars, working to get the pin while they were backing slowly; *that both of them were between the moving cars when the pin was pulled;* that Garvey pulled it with his hands while between the cars; and that they saw Garvey get out but never saw May get out. If the jury believed the version of plaintiff's witnesses, then they could not believe the testimony of defendants' witnesses that both May and Garvey got out in the clear before the cars were moved. They could hardly believe Garvey's version that the cars never came together again after they once separated, which is contrary to even the testimony of defendants' other witnesses. How could May have been crushed between the couplers if they did not come together? Therefore, if the jury believed plaintiff's witnesses, it would be a reasonable inference for them to make from the facts their testimony tended to show, considered in the light most favorable to plaintiff, that May never got out to the west, but was attempting to get out to the east when the cars separated and was caught in so doing when Garvey gave the last kick signal, or that May, never having stepped out on the west side and seeing the cars separate and knowing they might couple together again if they came together, attempted to get out that way not merely to get on the east side, but also to close the knuckle on his way out so that it would not be possible for the cars to couple up if they had to be kicked again. This inference could not be said to be unreasonable (or to be destroyed) merely because defendants had positive testimony that May got in the clear since this testimony was based on a state of facts that plaintiff's evidence positively contradicts, namely, that May never was between moving cars. One basis for such an inference would be that the plaintiff's testimony tended to show that the cars separated almost immediately after Garvey pulled the pin; that the time between his two kick signals was estimated at only five seconds; and that the cars only moved about eight feet after they separated until they

came together again. The remark of Garvey's, about the engineer knocking down the pin again, related by defendants' witness, would be an additional basis for such an inference. May might well have thought that Garvey would not signal for a kick until he closed the knuckle and got back on the east side where his next work was.

In this connection, defendants say that even though plaintiff's theory be true, "then the proximate cause of his injury would be the act of the foreman in giving the last back-up signal and not the condition of the coupler." However, under the Federal Employers' Liability Act, it is not necessary that a defective condition of the coupler be the sole cause of the injury. It is only necessary an injury result in whole or in part therefrom. [Alcorn v. Missouri Pacific Railroad Co., 333 Mo. 828, 63 S. W. (2d) 55, certiorari denied, 54 Sup. Ct. 228.] If May went between the cars because of the defective condition of the coupler and was on his way out when caught between the drawbars, then the foreman's act in giving the kick signal without knowing he was there, was merely a concurring cause. We, therefore, hold that there was substantial evidence to show that the defective condition of the coupler was the proximate cause of the injuries which caused May's death and that the instructions set out herein properly submitted the issues.

Defendants also assign as error the refusal of their Instructions N and P. Instruction N covered the defense of assumption of the risk by reason of May going back between the cars after having been in the clear. Instruction P covered the defense of contributory negligence because May violated a rule of the company in attempting to cross from the west side to the east side between two moving cars. As hereinabove stated, neither assumption of risk nor contributory negligence was a defense to a violation of the Safety Appliance Act. Moreover, Instructions 2 and 3, hereinabove set out, which the court gave at defendants' request, covered the matter fully and properly, by authorizing the jury to find for defendants if they found that May ever got in the clear, and clearly stating that plaintiff could not recover if May, thereafter, went back between the moving cars. They were correct, not because such conduct would be an assumption of risk or contributory negligence, but because such an act would be the sole cause of the injury. We do not see how the jury could have been confused about the issues. The court committed no error in refusing instructions N and P.

Defendants' final contention is that the verdict of $35,000 is excessive. The evidence shows that May was thirty-three years of age, in good health; that his life expectancy was 33.21 years; that at the time of his death his wife was thirty-two years old; that they had six minor children, four boys, fourteen, twelve, ten and seven years of age, and two girls, five and two years of age;

that May's average earnings were $200 per month; and that he contributed from $175 to $185 per month to the support of his family. May's widow had remarried after his death prior to the trial. The maximum amount, which we find has been approved in this State in a death case under the Federal Act, is $30,000 in Moran v. A., T. & S. F. Railroad Co., 330 Mo. 278, 48 S. W. (2d) 881, where both the employee killed and his widow were younger than in this case although the earnings were less. In Stottle v. C., R. I. & P. Railroad Co., 321 Mo. 1190, 18 S. W. (2d) 433, a verdict of $28,000 was approved where the employee was twenty-seven years old earning $180 per month and left a wife and two children. Verdicts of $25,000 were approved in Case v. St. L.-S. F. Railroad Co. (Mo.), 30 S. W. (2d) 1069; Oglesby v. St. L.-S. F. Railroad Co., 318 Mo. 79, 1 S. W. (2d) 172; Shaw v. C. & A. Railroad Co., 314 Mo. 123, 282 S. W. 416; while in Kidd v. C., R. I. & P. Railroad Co., 310 Mo. 1, 274 S. W. 1079, a verdict of $30,000 was held excessive and reduced to $25,000. That case was for the death of an engineer thirty-five years of age, leaving a widow thirty-four years of age and four minor children, ten, seven, four and one years of age; his average earnings were $184 per month. Calculating the present value of $180 per month (the amount of the average monthly contribution of May to his family's support) according to the statutory tables (Secs. 3132-34, R. S. 1929), on the basis of an annuity at six per cent for the widow's expectancy, we find the present worth to be $27,777.60. Calculating the present worth of May's entire earnings at $200 per month by the same tables, for his expectancy, we find the present worth to be $30,650.40. Considering that May's occupation was a hazardous one and that he might not for the whole thirty-three years have as great an earning power, it cannot be said with any certainty that even these amounts would actually represent the present worth of the loss of his earnings or contribution to his family by reason of his death. [Midland Bank & Trust Co. v. Davis, 288 Mo. 585, 233 S. W. 406; Pulliam v. Wheelock, 319 Mo. 139, 3 S. W. (2d) 374; Frese v. Wells (Mo.), 40 S. W. (2d) 652.] Of course financial contribution is not the sole measure of recovery and it is impossible to measure the value of the loss of a husband and parent by material standards. No recovery can be allowed for loss of companionship and mental anguish suffered because of his death. [Moran v. A. T. & S. F. Railroad Co., supra.] Under all the circumstances and under the standards heretofore fixed, we do not think that the verdict should be permitted to stand for more than $30,000.

It is, therefore, ordered that if respondent will, within ten days, enter a *remittitur* of $5,000 as of the date of judgment, the judg-

ment will be affirmed; otherwise, the judgment will be reversed and the cause remanded. *Ferguson* and *Sturgis, CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.