Mary Courtney, Defendant in Error, v. The Ocean Accident & Guaranty Corporation, Garnishee, Plaintiff in Error.—142 S. W. (2d) 858.

Division One, September 4, 1940.*

*NOTE: Opinion filed at May Term, 1940, June 28, 1940; motion for rehearing overruled August 16, 1940; motion to transfer to Court en Banc filed, motion overruled at September Term, September 4, 1940.

704

*Joseph N. Hassett* and *Ernest E. Baker* for plaintiff in error.

*Schaefer & Goldman* and *Edwin C. Luedde* for defendant in error.

BRADLEY, C.—This is a garnishment proceeding resulting in a judgment for $8075.80 against the garnishee, and brought up by writ of error.

Mary Courtney brought suit against Warren R. Sprague, March C. Sprague (husband and wife) and Wallace M. Smith, for the alleged wrongful death of her husband, Edward Courtney, who was killed when an elevator, upon which he was standing, fell. The suit resulted in a judgment against the Spragues for $8,000, and the costs amount to $75.80. The Spragues had a liability policy with the Ocean Accident and Guaranty Corporation, garnishee here, which they claimed covered the accident, but the garnishee claimed that the policy did not cover the case, and refused to defend the suit or pay the judgment. After an execution against the Spragues was returned *nulla bona,* these garnishment proceedings were commenced resulting in the judgment against garnishee as stated.

The Spragues owned a two story brick building, 29 by 155 feet, at 1901 Locust street, St. Louis. There was no basement. The first floor was concrete and the second wood. In the rear (north end) of the building and within 5 or 6 feet of the wall was a freight elevator or lift. Between the first and second floor there was no housing enclosing the elevator, but on the second floor there were board walls, extending up about 5 feet, on the north, east and south sides, to prevent stepping into the opening, and a top was over the board walls on the second floor. On the west side, second floor, was a gate that lifted. Witness Peebles, an electrical engineer, described the elevator thus:

"The elevator is a Sheppard-Lewis stacker or portable hoist, which is a device that has a platform mounted on wheels, whereby to move it around from place to place. There is a hinged arm that backs an upright, and that upright carries the shive or operating wheel around which the hoisting cable travels, and the base of the upright column has affixed to it a motor, gearing, and winding drum, and electrical controller. The arrangement is that the device will stand independently on any flat surface, irrespective of any building or structure, and is used primarily in warehouses where such articles

as bales of cotton are stacked, so that the bales may be elevated over other bales, and as the warehouse becomes loaded by the stacking of bales, the hoist is moved to a more convenient position.''

While this elevator was a portable, as witness Peebles said, it was stationary in this building. Peebles said that ''it was sunk in a pit'' in the concrete floor.

On the night of March 19, 1935, there was a fire in the rear of the Sprague building that damaged the elevator and the building. Wallace M. Smith had the contract to make what we may call the carpenter-work repairs, and Courtney (the deceased), employed by Smith, was making these repairs when the elevator fell. Smith testified:

''On Monday afternoon, April 22, 1935, Mr. Courtney was working around the shaft on the second floor. I was on the first floor and wanted to get to the second floor, and I tried to operate the elevator and it was stuck. So I looked up and saw that there was a board in between the elevator platform and the joists around the elevator, so I walked to the second floor and told Courtney that 'we must take that out and release the elevator.' Courtney loosened the upper end of the board and the other end wouldn't come so easily, so he stepped on the elevator and started to shake it, and as he did, it (the board) released and the elevator dropped. . . . At the time I asked Mr. Courtney to remove the board that was binding the elevator, Mr. Courtney was building the sides of this covering over the second floor at the elevator. By that I mean the upright portion there on the north side of the second floor and on the east side of the second floor. The boards there are what they call one-by-six No. 2 flooring.''

Garnishee, in its brief, gives an explanation of what happened when Smith ''tried to operate'' the elevator. ''The elevator machinery, in lifting and lowering the elevator, wound and unwound the cable around a drum or winch; when the elevator cage became jammed at the second floor of the building against the board which had been nailed there by Mr. Courtney, different persons, in attempting to use this elevator for service, had pulled the rope (Smith is the only one who pulled the rope while the board was in, so far as appears in the record) in an effort to lower the elevator from the second floor to the first floor, and when the elevator did not descend, the mechanism of the elevator in unwinding the cable from the winch left the cable attached to the platform of the elevator loose, so that when Mr. Courtney did release the board which had the elevator platform jammed, the platform fell.''

Garnishee contends that the repairs being made on the building when the elevator fell were, as a matter of law, *extraordinary repairs*, and that under the terms of the policy there was no liability. At the close of plaintiff's case and at the close of the whole case garnishee requested a directed verdict in its favor, but this was refused. The policy provision relied on by garnishee is as follows:

"Unless otherwise specifically written in or endorsed on this policy, said policy shall not cover . . . bodily injuries or death caused by the construction, reconstruction, demolition or *extraordinary repair* of any elevator or hoisting device, *or the building or structure* within which it is contained; but privilege is granted under this policy to make such ordinary alterations and repairs as are necessary to the care of any elevator covered herein and its maintenance in good condition, including the renewal of existing mechanical equipment, provided that such elevator shall not be used for service while such work is being done." (Italics ours.)

Smith, by whom Courtney was employed, had nothing to do with repairing the elevator as such. Repair of the elevator had been completed some ten days before Courtney was injured, and the work he was doing at the time was *a part* of the repair work on the building (Smith's job) and the decisive question is: Were the *repairs* to the building *extraordinary?* Mrs. Courtney, plaintiff below, says that the question was for the jury, and the garnishee says not. The damage, as a fire insurance loss, was submitted at $4700, but was adjusted for $3716.20. It is claimed, however, that the $3716.20 "included items of repair which were not actually done." Smith, before commencing repair of the building, submitted to the Spragues the following estimate:

"St. Louis, Mo., March 25, 1935.

"Mr. Warren Sprague, 1901 Locust St., St. Louis, Mo.

"Dear Sir: I give you herewith an estimate of the work to be done at the above address by reason of damage by fire:

First floor:

| | |
|---|---:|
| Replacing three doors, casings and trim at rear around closets | $ 37.50 |
| Work around elevator and near service door | 75.00 |
| Replacing 35 feet of beam supporting second floor joist | 65.00 |
| Clothes closet | 48.00 |
| Replacing side entrance door and frame | 26.50 |
| Replacing casing around steel sash | 162.00 |

Second floor:

| | |
|---|---:|
| Enclosing elevator | 60.00 |
| Replacing rear door, frame and transom | 26.50 |
| Replacing rear service door lift and weights | 20.00 |
| Replacing 800 feet floor | 96.00 |
| Replacing, repairing sash, frames, stops, cord on 17 openings | 259.90 |
| Repairing damage to scuttle hole and roof | 35.00 |
| Repairing and point brickwork | 45.00 |
| Replacing celotex cover over ceiling on two floors | 619.00 |
| Roofing | 135.00 |
| Painting | 553.00 |

| | |
|---|---|
| Plastering .................................... | 525.00 |
| Glazing ...................................... | 355.00 |

|  |  |
|---|---|
|  | $ 3,143.40 |
| Plus 10% profit ..................... | 314.34 |
|  | $ 3,457.74'' |

The carpenterwork repair, all done by Smith, amounted to $806.50, and the evidence was that the building was worth $33,000. Plaintiff, in her brief, says that ''whether in human experience $800.00 worth or $3,100.00 worth or even $4,700.00 worth of repairs on a $33,000.00 building is to be regarded as an extraordinary or as an ordinary repair is not decided by any rule of law or term of a contract, but can be decided only by the experience of builders and property owners and business men who must draw their inferences from the fact and who may easily draw different inferences as to whether it is an extraordinary or an ordinary repair. Such a question in the very nature of the case must be determined by the triers of the facts and is a question for the jury.''

█ It is settled law that a ''court should never withdraw a question from the jury, unless 'all reasonable men, in the honest exercise of a fair, impartial judgment, would draw the same conclusion, from the facts which condition the issue.' . . . Where there is uncertainty arising 'from a conflict in the testimony or because, the facts being undisputed, fair-minded men will honestly draw different conclusions from them, the question is not one of law but of fact to be settled by the jury.' '' [Parrent v. Mobile & Ohio Railroad Co., 334 Mo. 1202, 70 S. W. (2d) 1068, l. c. 1073, and cases there cited.]

Counsel say, and we find it so, that there is a dearth of authority on the question here for decision. Counsel for plaintiff cite many cases, but not one deals specifically with the question, and garnishee cites only one case defining extraordinary repairs, and that is Nixon v. Gammon, 191 Ky. 175, 229 S. W. 75. That case went off on a demurrer to the petition, but what was ruled is quite pertinent here. Plaintiff Nixon leased, from defendant, Gammon, for 10 years, a storeroom in Ashland, Kentucky. The rental was $150 per month, plus a $1000 bonus. Among other provisions, the lease provided that the lessee would ''keep said premises in good condition and repair,'' but that ''all extraordinary repairs required on said building shall be done by the lessor at his expense.'' And further, that at the option of the lessee, the lease would terminate if the building, during the lease, were destroyed or rendered untenantable by fire. Plaintiff had occupied the building about 8 months when a fire occurred, which, according to the petition, ''rendering the building untenantable . . . but did not destroy said building.'' It was further alleged that in order to render the building tenantable, after the fire,

"extraordinary repairs" were necessary. It was also alleged that plaintiff did not exercise his option to terminate the lease, but called upon defendant "to make the extraordinary repairs necessary to render" the building tenantable, and that defendant had refused. Plaintiff sought to recover what is called the unearned part of the $1000, and for other items.

The ruling sustaining the demurrer was affirmed, it seems, because there was no allegation that the building could, by extraordinary repairs, have been made tenantable without substantially rebuilding it. In the course of the opinion the court said (229 S. W. l. c. 77): " 'Ordinary repairs' are such as result from ordinary wear and tear of the building and its decay, but 'extraordinary repair' is something greater than this. It is such repairs as are made necessary by some unusual or unforeseen occurrence which does not destroy the building but merely renders it less suited to the use for which it was intended. The word 'repair' does not include the word 'rebuild' and the courts have never so held. If a house be destroyed by fire, to restore it would not be to 'repair' it, but to 'rebuild' it, and this is true even if the walls or some part thereof be standing in substantially the same condition in which they were before the fire. So, 'extraordinary repairs,' as used in the lease, did not include repairs made necessary by a substantial destruction of the building by fire, and as there was no specific covenant by the lessor to rebuild or repair in case of fire destroying the building, he was not under obligation to do so, and if he was not obligated to do so, plaintiff, Nixon, had no cause of action, nor is he entitled to recover the bonus or any part thereof, paid for said lease."

In Hill v. Employers' Liability Assur. Corp., 122 Conn. 193, 188 Atl. 277, it appears that the defendant insurance company issued to a bank a blanket liability policy that covered a certain building. The bank sold the building to Clark and Zirone and the policy was transferred to them. Amos Hill, a tenant in the building, was injured while descending a stairway, which injuries, he claimed, were caused by the negligence of Clark and Zirone in making changes in the building. Hill sued his landlords, and the insurance company was notified, but refused to defend. Judgment was rendered for Hill, but was not paid and he brought suit against the insurance company. The policy did "not cover injury or death . . . growing out of or due to the making of additions to, structural alterations in, or extraordinary repairs of the said premises unless a written permit is granted by the corporation specifically describing the work and an additional premium is paid therefor." In ruling the case the court said (188 Atl. l. c. 279):

"The appellant (the insurance company) assigns as error the finding as an ultimate fact that these changes constituted 'structural alterations in, or extraordinary repairs of' the premises. The uncontradicted evidence as to the nature of the changes shows that they included the

lowering of the floor of the tenement to conform to the level of that of the other store, the removal of partitions and the installation of columns and beams to carry the floor above, and an addition in the rear for a bakery oven. The lowering of the floor necessitated disconnecting the electric main running from the underground to the meter board. The facts found, especially when read in the light of the evidence from which they were derived, amply justify a finding that they amounted to such structural alterations and extraordinary repairs as to come within the scope of the policy provision requiring a written permit therefor and the payment of an additional premium.'' [See also Evansville Ice & Storage Co. v. Fidelity & Cas. Co., 61 Ind. App. 194, 111 N. E. 812; Western Warehouse Co. v. New Amsterdam Cas. Co., 85 Ore. 597, 167 Pac. 572; Home Mixture Guano Co. v. Ocean Accident & Guaranty Corp., 176 Fed. 600.]

█ Webster's New International Dictionary defines the word *ordinary* as ''belonging to what is usual; having or taking its place according to customary occurrences or procedure; usual, normal.'' The word *extraordinary* is defined by Webster as ''beyond or out of the common order or rule; not of the usual, customary, or regular kind; not ordinary.'' The repair work being done by Courtney at the time of his fall and death was a part of the whole repair, and it cannot. be said, in fairness and within reason, that the repairs were not extraordinary. Fair minds, in our opinion, could not differ.

We are not unmindful of the fact that as a general rule. an insured knows but little about his contract, but the court cannot rewrite the contract. We are constrained to hold that the judgment should be reversed. It is so ordered. *Hyde* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.