ELSA FINLEY, Administratrix of the Estate of CLAUD R. FINLEY, v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Appellant.—160 S. W. (2d) 735.

Division One, February 26, 1942.

Rehearing Denied, April 16, 1942.

M. G. Roberts, A. P. Stewart and C. H. Skinker, Jr., for appellant.

*Mark D. Eagleton* and *Roberts P. Elam* for respondent.

 BRADLEY, C.—Action under the Federal Employers' Liability Act, 45 U. S. C. A., Sec. 51 et seq. The verdict was for $40,000 in favor of plaintiff. On motion for a new trial a *remittitur* of $10,000

was made; the motion for new trial was overruled and defendant appealed.

Plaintiff is the widow of Claud R. Finley, deceased, and brought this suit as administratrix of his estate. The deceased was a car inspector, and was killed in a switching movement September 2, 1931, while on duty in defendant's yards at Chaffee, Missouri, and it is conceded that the cause is properly under the Federal Employers' Liability Act.

Five separate acts of negligence were alleged, but all go to the violation of defendant's rule No. 1266, called the blind shove rule, which reads as follows: "Cars must not be shoved until a trainman or yardman has gone to the opposite end of a cut of cars and given a proper signal; a blind shove must never be made."

The answer was a general denial and assumption of risk. The reply was a general denial.

Error is assigned on the refusal, at the close of the case, of defendant's demurrer to the evidence, and on an alleged excessive verdict.

The tracks in defendant's Chaffee yards extend north and south, and are numbered consecutively from east to west, beginning with track No. 1 on the east. The south part of track No. 1 is the lead track, from the west side of which switch tracks 2, 3, 4, etc., lead off. The north part of track No. 1 was known also as the local track, and cars of local freight were placed thereon. The clearance between cars on track No. 1 and cars immediately west on track 2 was 3 feet and 9 inches. Finley was struck and killed about 1 o'clock A. M. The night was dark and, absent a light, a railroad car, according to the evidence, could not be seen until one was within 30 to 45 feet of it. The light of a lantern, however, could be seen as far away as 30 to 40 car lengths.

Shortly before Finley was struck he and Martin V. Menz, another car inspector, and with whom Finley was working that night, were standing west of switch track No. 2. They were waiting for freight train No. 839, from St. Louis to Memphis, to arrive, and intended to make a partial inspection as the train moved by in the yards. The inspection was to be completed after the train stopped. When train No. 839, approaching from the north on switch track No. 2, was about 400 feet north of Finley and Menz, Finley crossed over to the east side of track No. 2 in order to inspect on the east side of the train, while Menz inspected on the west side. When the train reached Menz and Finley, they squatted down, Menz facing east and Finley facing west, and facing each other, but on opposite sides of the train. While squatted Menz could see Finley and could see his lighted lantern. Train No. 839 had about 50 cars. After a number of these cars had passed Menz and Finley, Menz heard the sound of cars coming together to the south of the point where he and Finley were, and

very shortly thereafter he noticed that Finley's light had disappeared. When about 25 cars of train No. 839 had passed, the train came to a stop and Menz immediately climbed between the cars to the east side and found Finley's dead body lying near the west side of track No. 1, and about 10 or 15 feet north of the point where he was when the light of his lantern disappeared. The north car of a cut of cars being shoved north on track No. 1 struck and killed deceased. No blood was found on the front of the north car, but blood was found on the west side on the second journal box from the north end, which journal box was about 5 feet south of the north end of the car. Also, scraps of blue denim overalls were found at the northwest corner of the car. It is conceded that no trainman was on the north end of the cut that was being shoved north, and plaintiff contends that such being so, the movement resulting in the death of Finley was a blind shove and in violation of rule No. 1266. Defendant contends that such movement was not a blind shove, and that the rule was not violated.

The switching crew was composed of the engineer, fireman, the foreman, Mitchell, switchman Gordon, who was the pin puller and worked near the engine, and switchman Morris, who worked in the field and farthest from the engine. There were, according to Morris, about 33 cars standing on track No. 1, and it was desired to get some of these cars out. The switch engine, headed north, was at the south end of track No. 1. Morris, who was up ahead, cut the string of cars, standing on track No. 1, some three cars south of the north end of the string, and about 30 cars were pulled south on track No. 1. Some of the cars pulled south on track No. 1 were kicked onto the switch tracks where desired, and from 3 to 5 were kicked back up track No. 1. Morris, on top of this cut of 3 to 5, set the brakes and stopped the cut 5 or 6 car lengths south of the 3 cars left originally on track No. 1 when Morris cut the string. When Morris set the brakes and stopped the cut of 3 to 5 cars, he got down and walked south towards the engine, and while he was walking south other cars were brought onto track No. 1 south of Morris, and these were pushed north to the cut of 3 to 5 cars upon which Morris had set the brakes. The two cuts were then moved north on track No. 1 by what plaintiff calls the blind shove and resulted in Finley's death.

Morris, plaintiff's witness, defined blind shove in this way: "Q. If an engine was moving, as this engine was moving, on the occasion, just prior to this injury, the engine to the south, the cars to the north, with no one on the north end, is that a blind shove? A. Absolutely." Plaintiff's witness, Stanfield, was employed by defendant at Chaffee, at the time of Finley's death, and was working as a switchman in the through freight service; had been employed by defendant since 1912. He defined a blind shove as follows: "Q. If you are shov-

ing north on track number one, and your engine is to the south, and you have a cut of cars north of you, whether the cars are fifteen or twenty or thirty, or whatever they are, and you are shoving to the north and no one is at the north end of the cut on the headmost car, that would be the northernmost car, is that a blind shove? A. That is a blind shove; yes, sir.'' In the brief defendant says:

''The interpretation given to defendant's blind shove rule by plaintiff's witnesses was to the effect that where cars or groups of cars are standing on a track, as they were on track 1 on the occasion in question, and it becomes necessary to shove the track, that is, to have the engine shove or push these standing cars northwardly and closer together in order to get the south end of the track into the clear, or for any other purpose, there should be a man at the north end of the cars being moved; that this man (in the instant case the field man, Morris) should have been on the ladder on the east side of the north car, near the north end thereof, and that by making this shoving movement on track 1 on the occasion in question without Morris or any other member of the crew being at such place the blind shove rule was violated.''

Foreman Mitchell, as a witness for defendant, gave defendant's construction of the blind shove rule as follows: ''Q. Now, as I understand it, in the shove that was made at the time of the accident to Mr. Finley, you say that that was not a blind shove. Is that correct? A. No, sir; it was not a blind shove. Q. Why not? A. Because I knew just how many cars we had hold of, had a list of the cars, knew the physical outlay of the track, how many cars to put back, and knew everything in connection with those cars, and you wouldn't consider it a blind shove as long as I knew all about those cars. . . . Q. And under that rule (1266), as I understand it, and as I understand you, you are not required to have a man in a conspicuous position on the front of the cars? A. Not if you are making up a train and you know the condition as to what you are doing, you know your room and know where your cars are going, and everything that is necessary to know to make a safe move.''

As appears, supra, plaintiff and defendant differed as to the construction of the blind shove rule, and, the verdict being for plaintiff, defendant, in effect, concedes that, for the purposes of this appeal, the rule must be considered to mean as construed by plaintiff. Defendant, however, contends that there was no substantial evidence tending to show a causal connection between the violation of the rule and the death of Finley. Plaintiff's evidence, defendant argues, must have been sufficient to support ''a finding that if Morris had been at the place described near the north end of said car the accident would not have happened, and such a finding must not be based upon speculation and conjecture.''

In Settle v. St. Louis-San Francisco R. Co., 127 Mo. 336, 30 S. W. 125, it is said [127 Mo. l. c. 341]: ''It is undoubtedly true, as in-

sisted by defendant's counsel, that in actions for damages on account of negligence, plaintiff is bound to prove, not only the negligence, but that it was the cause of the damage. This causal connection must be proved by evidence, as a fact, and not be left to mere speculation and conjecture. The rule does not require, however, that there must be direct proof of the fact itself.. This would often be impossible. It will be sufficient if the facts proved are of such a nature, and are so connected and related to each other that the conclusion therefrom may be fairly inferred.'' [See also Brainard v. Mo. Pac. Ry. Co., 319 Mo. 890, 5 S. W. (2d) 15, l. c. 17; Freeman v. Kansas City Pub. Serv. Co. (Mo. App.), 30 S. W. (2d) 176, l. c. 181.]

Also, it is the rule that ''plaintiff's evidence need not exclude the possibility of accident or of a cause for which defendant is not liable, but it is sufficient to make a submissible case if there is substantial evidence that the injury resulted from a cause for which defendant is liable.'' [Cech et al. v. Mallinckrodt Chemical Co., 323 Mo. 601, 20 S. W. (2d) 509, l. c. 515; Woelfle v. Connecticut Mut. Life Ins. Co., 234 Mo. App. 135, 112 S. W. (2d) 865, l. c. 875.]

Pertinent on the point that there was no causal connection between the alleged cause and the effect complained of, Morris testified: ''Q. Had you known in advance that this shove was going to be made to the north, which was made after you had gotten on the ground, as you have indicated, what would you have done in the line of your duty? A. Well, if they made that shove when I was upon it (the north car), I would have watched that head end to see that there would be no danger.''

Witness Stanfield, referred to, supra, testified: ''Q. Now, in compliance with the rule (1266) as it is stated in the rule book, did you, when making shoves in the Chaffee yards, when occasion demanded it, notify men who were working down there at the blind end of the cut of cars that it was about to be shoved? A. Yes, sir. Q. Did you notify men such as car inspectors, and regardless of the character of their employment? A. Yes, sir. . . . Q. With the switching crew coming in on track number 1 for the purpose of shoving, if they decide to make a shove, and you say that your duty requires you to go to the north end to protect it and to see if there are any men working in close proximity, if you find a car inspector squatting down on the east side of track number 2, with his lights shining down, a lighted lantern shining down, so as to detect any brake beams that might be breaking or any other part of the company's property that might cause damage or injury, and he is in that position squatting down, as indicated by the witness Menz—you were here when he indicated that, were you? A. Yes, sir. Q. If you have a man in that position, and you go to the rear end or the north end and find a man engaged in that pursuit in that manner as described by witness Menz, what, under the circumstances, would be your duty in so far as the

giving of any signal to go on or shove is concerned? A. If he was squatted down I would notify him we were going to shove the track."

It is trite and frequently repeated that "it is settled law that a 'court should never withdraw a question from the jury, unless "all reasonable men, in the honest exercise of a fair, impartial judgment, ▮▮▮ would draw the same conclusion from the facts which condition the issue." . . . Where there is uncertainty arising "from a conflict in the testimony or because, the facts being undisputed, fair-minded men will honestly draw different conclusions from them, the question is not one of law but of fact to be settled by the jury." ' " [Courtney v. Ocean Accident & Guaranty Corporation, 346 Mo. 703, 142 S. W. (2d) 858, l. c. 860; Parrent v. Mobile & Ohio R. Co., 334 Mo. 1202, 70 S. W. (2d) 1068, l. c. 1073, and cases there cited.]

We think that the question as to whether there was any causal connection between the violation of rule 1266 and Finley's death was for the jury.

▮▮ Did the deceased, under the facts, assume the risk as a matter of law? As supporting the contention that deceased so assumed the risk, defendant cites Toledo, St. L. & Western R. Co. v. Allen, 276 U. S. 165, 48 Sup. Ct. 215, 72 L. Ed. 513; Norfolk & Western R. Co. v. Collingsworth, 32 Fed. (2d) 561; Jones v. St. Louis-San Francisco R. Co., 325 Mo. 1153, 30 S. W. (2d) 481; Cain v. Fort Worth & Denver City R. Co., 75 Fed. (2d) 103; Hoch v. St. Louis-San Francisco R. Co., 315 Mo. 1199, 287 S. W. 1047.

The defense of the assumption of risk under the Federal Employers' Liability Act was practically abolished by the amendment of August 11, 1939 (See 45 U. S. C. A., Sec. 54), but the facts, as appears, supra, of the present cause occurred prior to the amendment. As the law was, prior to the amendment, the employee assumed "the ordinary risks of his employment, and, when obvious or fully known and appreciated by him, the extraordinary risks and those due to negligence of his employer and fellow employees." [Toledo, St. L. & W. R. Co. v. Allen, 276 U. S. 165, 48 Sup. Ct. 215, 72 L. Ed. 513, and cases there (276 U. S. l. c. 169) cited.] Such defense, however, could not be successfully invoked when the injury complained of arose from a single act of negligence creating a sudden emergency without warning to the injured employee or where he did not have sufficient opportunity to appreciate the danger. [Jenkins v. Kurn et al., 348 Mo. 942, 156 S. W. (2d) 668, l. c. 670, and cases there cited.]

In the present case there was no sudden emergency, but certainly the evidence tends to show that the deceased had no opportunity to appreciate the danger he was in when squatted, facing west, between tracks numbers 1 and 2, when the blind shove movement was approaching from the south on track No. 1. O'Donnell v. Baltimore & Ohio R. Co., 324 Mo. 1097, 26 S. W. (2d) 929, was under the Federal

Employers' Liability Act. That case, as is the present case, was for damages for the death of a car inspector struck and killed while on duty between two tracks. In that case the court said [26 S. W. (2d) l. c. 933]:

"The general federal rule is that a railroad company rests under no duty to employees working in its yards to sound bell or whistle on switch engines moving thereabout. [Aerkfetz v. Humphreys, 145 U. S. 418, 420, 12 Sup. Ct. 835, 836, 36 L. Ed. 758, 759.] An employee takes upon himself the hazard involved in going on or near tracks where he knows cars are likely to be shunted without warning, Toledo, St. L. & W. R. Co. v. Allen, 276 U. S. 165, 171, 48 Sup. Ct. 215, 217, 72 L. Ed. 513, 516. But an exception to the doctrine of the Aerkfetz case is allowed in instances when the switching movement which produced the injury was covered by a rule or custom to give warning signals, established and observed for the protection of employees of the class involved, and the employee is shown to have been working in the line of duty at the time. The servant has the right in such instances to depend on the giving of the signal and does not assume the risk of injury if and in so far as it may grow out of a negligent failure to sound the warning, unless the hazard from that source was obvious, or fully known and appreciated by him," citing C. & O. Ry. Co. v. Mihas, 280 U. S. 102, 50 Sup. Ct. 43, 74 L. Ed. 207; Pacheco v. N. Y., N. H., & H. R. Co., 15 Fed. (2d) 467; Lehigh Valley R. Co. v. Doktor, 290 Fed. 760, 763; Dir. Gen. of Railroads v. Templin, 268 Fed. 483, 485, certiorari denied 254 U. S. 656, 41 Sup. Ct. 218, 65 L. Ed. 460.

It is our opinion, and we so rule, that the question of assumption of risk was one for the jury.

As appears, supra, the verdict was for $40,000, and a *remittitur* of $10,000 was made in the trial court. Defendant contends, however, that $30,000 is excessive. The question of excessive damages is always a vexing one. A frequently invoked rule, when a question of excessive damages is for disposition, is what is termed the rule of uniformity. That rule may be stated as ▮ follows: When the facts in other cases are similar to the facts in hand, there should be a reasonable uniformity as to the amount of damages. [See Mickel v. Thompson, 348 Mo. 991, 156 S. W. (2d) 721, l. c. 728, and cases there cited.]

In the present case, deceased, at time of his death, was 38 years old; his expectancy was 29.62 years. He left, surviving, his widow, then 34, and two sons, 2 and 9½ years old. The average monthly earnings of the deceased, for the 3 years immediately before his death, were $167.16.

Hancock v. Kansas City Terminal Ry. Co., 347 Mo. 166, 146 S. W. (2d) 627, was under the Federal Employers' Liability Act for damages for the death of the plaintiff's husband who was foreman of a switch-

ing crew. Hancock was 38 years old, and his expectancy was 29.62 years, same as Finley, the deceased in the present case. Hancock's widow was 32, and plaintiff, in the present case, was 34. Hancock left one son, age 11, and as appears, supra, Finley left two sons, 2 and 9½ years old. Hancock's average monthly earnings for the two years immediately prior to his death were $180.31, and Finley's average monthly earnings for the three years immediately prior to his death were $167.16. A *remittitur* of $5,000 was required in the Hancock case, which reduced the judgment to $25,000.

In the Hancock case it is said [146 S. W. (2d) l. c. 630]: "We know of only two death cases in this State, under the Federal Employers' Liability Act, in which judgments have been affirmed for $30,000, without any element of conscious pain and suffering. (There was no evidence of such in the present case.) These cases are Moran v. A., T. & S. F. R. Co., 330 Mo. 278, 48 S. W. (2d) 881; and Truesdale v. Wheelock, 335 Mo. 924, 74 S. W. (2d) 585; see comments on these cases by court en banc in Sheehan v. Terminal R. Assn., 344 Mo. 586, 127 S. W. (2d) 657. In the Truesdale case, the man killed was younger and left more dependents than in this case. He also had greater earnings. In the Moran case (which was a four to three decision in banc, and while the dissent was not on damages, it would have allowed a new trial), the man killed was also younger and he left younger dependents. The majority opinion commented on the fact that defendant asked no instruction on the measure of damages, as one reason for sustaining the verdict. In Stottle v. C., R. I. & P. R. Co., 321 Mo. 1190, 18 S. W. (2d) 433, a $28,000 judgment was affirmed for death of a man with earnings the same as in this case. He was much younger than Hancock and also left younger dependents. In Kidd v. C., R. I. & P. R. Co., 310 Mo. 1, 274 S. W. 1079, a verdict for $30,000 was held excessive and a $5,000 *remittitur* required. There also the man was younger than here (with somewhat larger earnings) and left more and younger children dependent upon him. Other cases, in which $25,000 verdicts were approved, are cited in the Truesdale case."

We think that the rule of uniformity will be more nearly observed if the present judgment is reduced to $25,000. Therefore, if plaintiff, within ten days from April 16, 1942, will file here a *remittitur* of $5,000, to be effective as of the date of the verdict, the judgment for $25,000 will be affirmed, otherwise, the judgment will be reversed and the cause remanded. It is so ordered. *Hyde, C.*, concurs; *Dalton, C.*, not sitting.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.