[S. F. No. 21843. In Bank. Dec. 14, 1965.]

Estate of LAWRENCE ARCHER KELLEY, Deceased. HOLLY RE JACKSON, Plaintiff and Appellant, v. KATHLEEN KELLEY YOUNG et al., Defendants and Appellants.

Franklin P. Jackson, Eisner & Titchell, Norman A. Eisner and Haskell Titchell for Plaintiff and Appellant.

Rogers, Wilcox & Gordon, William L. Gordon and Clarence A. Rogers for Defendants and Appellants.

TRAYNOR, C. J.—Before his death in 1955, Lawrence Kelley owned a lot and building in Berkeley that was leased to Roos Brothers as a clothing store. He devised the property to Robert Southern, Martin Minney, and his wife Holly Kelley (now Holly Jackson) to hold as trustees of four separate trusts, the corpora of which are one undivided 55 per cent interest in the property and three undivided 15 per cent interests therein. Holly is to receive the income of the first trust for life. Three children of the testator are income beneficiaries of the remaining trusts. Upon the death of Holly, all trusts are to terminate and each child is to receive an undivided one-third interest in the entire trust property.[1] The will authorizes a majority of the trustees to act and to sell, lease, or otherwise dispose of any trust property and to invest and reinvest unrestricted by statutory limitations on trust investments. The will contains no instructions as to how trust expenses are to be apportioned between principal and income.

At the time of the testator's death, the property was appraised at $160,000, of which $75,000 was attributed to the building.

The lease expired at the end of 1960. In April 1959, Roos Brothers told the trustees that it was unwilling to enter into a new lease unless they would agree to remodel the building and install new fixtures at a total cost of about $200,000. To

---

[1]Other provisions, which need not be set forth here, apply in the event a child dies before the trusts terminate.

enable the trustees to finance the proposed improvements, Roos Brothers indicated that it would agree to pay a specified minimum rent.

The trustees employed Mason-McDuffie Co., a firm specializing in commercial properties, to advise them of the various alternative uses to which the building might be put. The firm advised that the building was then salable only as a vacant building at a loss and that there was no likelihood of the trustees' obtaining any new tenant without first making improvements comparable to those suggested by Roos Brothers. If the trustees made such improvements, they would still be unlikely to find any tenant who would be willing to pay higher rent than Roos Brothers offered. This rent, after provisions for amortization of the loan and other expenses, would yield an annual income of approximately $18,000, slightly less than previously received if depreciation were disregarded. Mason-McDuffie concluded that if the trustees installed the improvements proposed by Roos Brothers and leased the building for 25 years at a minimum rent even lower than Roos Brothers offered, the property could be readily sold to an institutional investor for approximately $450,000.

Upon the expiration of the original lease, trustees Minney and Southern, over the objection of Holly Jackson, entered into a new lease with Roos Brothers for a term of 20 years. The lease provided for a specified minimum rent and required the trustees to spend $125,000 to remodel and modernize the building, and $75,000 to design, plan, purchase, and install new fixtures. Minney and Southern petitioned the court for approval and confirmation of the lease and for authority to borrow $200,000 for the purposes specified therein. On July 19, 1961, the court granted their petition.

Minney and Southern obtained a $200,000 loan, secured by a deed of trust on the building, repayable including interest in 20 years at $5,200 per quarter for 10 years and at $2,696 per quarter thereafter. They paid an architect's fee, a lender's fee, and a loan commitment fee. Since the rental income from the store building was the only source of trust funds, these expenses, totaling $4,050, plus the quarterly payments on the loan, were all made from such income subject to later apportionment between trust income and principal. With court approval, Minney and Southern also paid $7,513.11 in addition to the proceeds of the loan to complete the improvements.

On June 10, 1963, the court settled the trustees' fourth account and apportioned against trust principal a $500 fee paid to Mason-McDuffie Co. and one-half ($4,477.50) of certain trustees' and attorneys' fees in the amount of $8,955, with instructions that all of these fees be paid initially from trust income with subsequent reimbursement to Holly Jackson. It also approved an amendment to the lease extending the term from 20 to 22 years.

On August 6, 1963, Holly Jackson filed a trustee's petition for instructions as to the manner in which the improvements to the trust should be paid for and apportioned between principal and income of the trust. On January 2, 1964, the court entered its ''Order Instructing Trustees Regarding Apportionment of Expenses and Reimbursement of Income Account.'' It directed that the payments on the $75,000 part of the loan allocated to design and installation of fixtures be charged, both as to principal and interest, against current income, and that the payments on the $125,000 part allocated to improvement and modernization of the building be charged against trust principal to the extent that they represented repayment of loan principal and charged against trust income to the extent that they represented interest on the loan. To provide funds for the part of the loan payments chargeable to principal, the court authorized the trustees to charge depreciation in the amount of each principal payment against the income interests of the remaindermen and withhold such amounts from the income otherwise due them. It provided that no part of the loan payments chargeable to principal should be deducted from the income due Holly Jackson. It ruled that the $16,540.61 that had already been expended out of trust income to pay architect's fees, appraisal fees, loan standby fees, the loan commitment fee, the amounts due contractors and materialmen, and one-half of the above mentioned trustees' and attorneys' fees, was properly chargeable against trust principal and gave Holly Jackson an equitable lien of $9,097.33 upon the trust property to secure repayment of her 55 per cent interest in the amount spent. It directed the trustees to discharge this lien within three years of the date of the order with funds to be obtained by increasing the present loan, by negotiating a new loan, or in such other manner as they might recommend to the court.

The court vacated and set aside this order as inadvertently made on April 1, 1964, but reaffirmed it in toto by an order of April 27, 1964. All of the beneficiaries appeal.

Holly Jackson contends that the court erred in apportioning against trust income the payments amortizing principal on the $75,000 part of the loan allocated to fixtures. She contends that none of the improvements were "ordinary repairs" within the meaning of the Principal and Income Law. (Civ. Code, §§ 730-730.15.)

The remaindermen, on the other hand, contend that it was error to apportion against principal the payments amortizing the expenditure allocated to the improvement and modernization of the building on the ground that all of the work done was ordinary repairs. They construe "ordinary repairs" as including any work needed to keep the property in tenantable condition.

All parties invoke *Estate of Roberts*, 27 Cal.2d 70 [162 P.2d 461], which distinguished between ordinary and extraordinary expenses for the purpose of allocating expenses between income and principal in managing property held temporarily in an estate during administration. The administration of the estate in that case was not subject to the Principal and Income Law, and the issue involved was not the allocation of expenses relating to property held as a trust investment. The *Roberts* case is therefore not in point.

The Principal and Income Law provides: "All ordinary expenses incurred in connection with the trust estate or with its administration and management, including regularly recurring taxes assessed against any portion of the principal, water rates, premiums on insurance taken upon the estates of both tenant and remainderman, interest on mortgages on the principal, ordinary repairs, compensation of assistants and court costs on regular accountings, except attorneys' fees and trustees' compensation, shall be paid out of income. . . ." (Civ. Code, § 730.15, subd. (1).) ██ The improvement and modernization of the store building undertaken by the trustees pursuant to the Roos Brothers lease were not ordinary repairs within the meaning of this section. ██ Ordinary repairs are those incidental repairs that do not materially add to the value of the property or appreciably prolong its life, but keep it in efficient operating condition. They are customarily treated as charges against income by accountants and accepted as such for both federal and state tax purposes. (26 C.F.R. 1.162-1.164; Cal. Admin. Code, tit. 18, reg. 17202(d).) ██ The renovation of the store building constituted a capital improvement. The work was undertaken, not to maintain a state of repair existing when

the property was received by the trustees, but to offset obsolescence brought about by changes in merchandising techniques. It materially increased the value of the property. (See Bogert on Trusts (2d ed.) § 805.) The installation of new fixtures was also a capital improvement. Although replacement of fixtures, component parts of a structure, or of mechanical apparatus may be ordinary repairs when done to maintain operating efficiency, that was not the purpose of the expenditures here. The purpose was to provide the lessee with essentially a new store, adapted for modern merchandising techniques. The trial court therefore erred in treating the expenditures for fixtures as ordinary repairs.

Holly Jackson contends that inasmuch as the expense was not incurred for ordinary repairs or other purposes specifically enumerated in section 730.15, subdivision (1), the Principal and Income Law prohibits allocating any costs related to these expenditures to income. She contends that the income beneficiary of a trust whose trustees have borrowed money to improve trust property and thus generate increased income is entitled to all of the income without regard to the interests of the remaindermen, who, she asserts, must ultimately pay for the improvements. This position is untenable.

▌ Section 730.15 does not limit the "ordinary expenses" that may be charged to income to those specifically enumerated.

▌ The purpose of the trust and the nature of the assets that comprise its corpus will determine what expenses are "ordinary expenses" in a given situation. When improvement of commercial or rental realty held in a trust is undertaken by the trustees and is financed with nontrust capital, depreciation of that improvement is a proper and "ordinary" expense of managing that trust. The improvement generates additional income for the life beneficiary, but if it depreciates in value with the passage of time, it will not benefit the remaindermen unless the trust terminates before the end of the useful life of the improvement. To require the remaindermen to pay the entire cost of a trust activity undertaken for the benefit of all the beneficiaries would contravene both the intent of the testator and the express provisions of the Principal and Income Law that ordinary expenses of trust management be met by income.

▌ There is no merit in the contention that the failure of the Legislature to adopt the provision of the Uniform Principal and Income Act directing amortization of the cost of improvements that represent an addition of value to the trust

demonstrates that none of such costs can be charged to income. In adopting the Principal and Income Law, the Legislature departed so substantially from the uniform act that its failure to adopt that particular provision of the act sheds no light on the interpretation of the provisions of the California law.

The corpus of the Kelley trust has not been impaired by the loan obligation incurred by the trustees, for the value of the property has been increased by more than the amount of the loan. Amortization of the cost of the improvement out of income, as suggested by the remaindermen, is therefore not justified. Charging depreciation based on the value of the improvements and calculated over the anticipated useful life of the improvements, however, will allocate the expense between income beneficiary and remaindermen in a manner properly reflecting the benefit to each. (Rest. 2d Trusts, § 233, com. k, *l.*)

Allocation of the amounts withheld from income to a depreciation reserve account will provide a fund to meet the expense of making the improvements and of needed upkeep. "It avoids the necessity of speculating upon the probable duration of the trust and deducting immediately a gross sum from the income for the whole period. It results in an equalization of the income from year to year instead of the deduction of a large amount all in one year. If the life beneficiary lives as long as the probable duration of the improvements, he will ultimately have paid for the improvements, which is just, because in that case the remainderman ordinarily will have no advantage from the improvements. If the life beneficiary dies within a short time after the improvements are made, he pays for no more than the actual enjoyment he has had, and the remainderman who profits in that case pays the balance of the cost." (3 Scott, Trusts (2d ed.) § 233, p. 1760.) The trial court erred in allowing depreciation in an arbitrary amount to meet the principal payments allocated to improvements and modernization and in providing that such depreciation should be charged only against the income interests of the remaindermen.

Depreciation of commercial or rental realty that formed part of the original trust corpus is also a proper trust expense unless the testator has expressed a contrary intent.

Rules to the effect that the remainderman must bear the burden of shrinkage of trust capital due to depreciation were the outgrowth of concepts developed during the last century to govern the relation between legal life tenants and re-

maindermen. Such rules are not adequate to assure either profitable or equitable administration of a contemporary trust. (See Krasnowiecki, *Existing Rules of Trust Administration: A Stranglehold on the Trustee-Controlled Business Enterprise*, 110 U.Pa.L.Rev. 506.) The trustee today who elects to retain realty in a trust, or who chooses to invest trust assets in realty when permitted to do so by the court or the trust instrument, does so because he believes it to be a sound trust investment. It is such an investment, however, only if the interests of both the income beneficiary, who expects to receive a return equivalent to other well-managed trusts, and the remainderman, for whom the trustee must conserve the corpus to the greatest extent possible while promoting growth consistent with the general economy, are protected. ▮ When a trustee who has the power to sell realty held in the trust and to reinvest the proceeds therefrom, elects instead to retain the property, the duty to preserve the corpus remains. Since depletion of the principal tends to frustrate the fundamental purpose of the trust, he must adopt a method of accounting that will prevent the impairment of the principal unless the testator has clearly indicated a contrary intent. (*Estate of Gartenlaub,* 185 Cal. 648, 652 [198 P. 209, 16 A.L.R. 520].) An awareness that sound trust management requires that business properties be managed by trustees in such a way that they are not permitted to deteriorate at the expense of the remainderman is reflected in the decision of the Commissioners on Uniform State Laws to provide for a depreciation reserve account in the Uniform Revised Principal and Income Act (1962).[2] (See Bogert, *Uniform Principal and Income Act Revised,* 101 Trusts and Estates 787.)

▮ When realty other than that to be occupied by the beneficiary is retained in a trust, the trustee must administer it as a business, allocating expenses in accordance with accepted accounting procedures if he is to fulfill his obligation to income beneficiary and remainderman and fulfill the normal intentions of the testator. (See Krasnowiecki, *op. cit. supra,* at p. 549.)

▮ The Principal and Income Law directs that income beneficiaries receive "All income after payment of expenses properly chargeable to it" (Civ. Code, § 730.05, subd. (3)) and that net profits "computed in accordance with the cus-

---

[2]Section 13(a): "The following charges shall be made against income: . . . (2) a reasonable allowance for depreciation on property subject to depreciation under generally accepted accounting principles, . . ."

tomary practice of such business but not in such way as to decrease principal" be deemed income of a business continued by trustees who receive it from the original owner. (Civ. Code, § 730.09.) In specifying "proper expenses" and "customary practice," the Legislature did not provide that trust accounting methods remain static. The language chosen demonstrates legislative recognition that techniques of business management change and that trust administration should keep pace with business practice in this regard. ▮ Property used in a trade or business continued by trustees is depreciable under section 730.09 of the Civil Code. As commercial or rental realty retained by trustees cannot be meaningfully distinguished from property used in a trade or business, it should be treated in a similar manner. (See Dunham, Scott, and Wolf, *Uniform Revised Principal and Income Act,* 101 Trusts and Estates 894, 897.)

▮ Lawrence Kelley authorized his trustees to retain or sell the building that comprised the corpus of the trust. He empowered the trustees to invest and reinvest the trust assets. The building was under lease and was an income producing investment at the time the will was executed. In the absence of evidence regarding his prior management of the property indicating a contrary intent, the only reasonable inference is that Mr. Kelley intended his trustees to manage the property as an investment and to maintain the value of the trust corpus by providing a reserve for depreciation. (See Bogert on Trusts (2d ed.) § 802.) ▮ The trustees' past practice in this respect is not clear, but since the order settling the fourth account is now final, consideration of any error with respect to depreciation before then is foreclosed. Since the court did not determine future allocation between income and principal, either in that order or in the order authorizing the trustees to execute the new lease and make the improvements, it must do so now.

On remand the parties may wish to present additional evidence on the issues involved. ▮ On the record now before us, however, it appears that the trustees should establish a depreciation schedule under which the improvements to the store building, including fixtures, will be depreciated on a straight line basis over their anticipated useful life. The interest part of any payments on the loan should be allocated to income as directed by the Principal and Income Law.[3] (Civ.

---

[3]All parties concede that it is proper to allocate the interest portion of the payments on the loan to income.

Code, § 730.15.) Additionally, the value of the store building itself, before the modernization, is subject to depreciation. If at any time the principal part of the loan payments exceeds the depreciation reserve available to meet it, the income beneficiaries should be given a lien against the corpus for the excess.

The order appealed from is reversed; all parties to bear their own costs on appeal.

McComb, J., Peters, J., Tobriner, J., Peek, J., Mosk, J., and Burke, J., concurred.

The petition of the plaintiff and appellant for a rehearing was denied January 12, 1966. McComb, J., was of the opinion that the petition should be granted.