**ATLANTA & ST. ANDREWS BAY RAILWAY COMPANY, a corporation, Individually, and for the Use and Benefit of Northwestern National Insurance Company, a corporation, Plaintiff,**

v.

**CHILEAN NITRATE SALES CORPORATION, a corporation, Defendant and Third-Party Plaintiff,**

v.

**SMITH STEVEDORING & FORWARDING COMPANY, a corporation, Third-Party Defendant.**

Civ. A. No. 589.

United States District Court
N. D. Florida,
Marianna Division.

Nov. 2, 1967.

Charles S. Isler, Jr., of Isler & Welch, Panama City, Fla., for plaintiff.

Dempsey J. Barron, of Barron & Hilton, Panama City, Fla., for defendant & third-party plaintiff.

Charles Cook Howell, Jr., Jacksonville, Fla., for third-party defendant.

## MEMORANDUM-DECISION

CARSWELL, Chief Judge.

Under consideration here is interpretation of contractual agreements of lease of buildings and covenants with respect to use of certain machinery and equipment. The essential and material facts have been adduced to record and are not in dispute. The issue is presented on Motion for Summary Judgment filed by plaintiff, Atlanta & St. Andrews Bay Railway Company ("Railway") against defendant-third-party plaintiff, Chilean Nitrate Sales Corporation ("Chilean"). The motion is directed only to the issue of liability for fire damage to warehouse building, machinery and equipment held by Chilean pursuant to a lease contract from Railway and operated for and on behalf of Chilean by third-party defendant, Smith Stevedoring and Forwarding Company ("Smith"). There is on record a general agency contract and agreement ("the agreement") between Chilean and Smith. The Court concludes that the motion for summary judgment on the issue of liability should be granted. The terms of the lease and the agreement control, and these provisions read in the context of the record as developed convince the Court that there is no genuine issue as to any material fact and Railway is entitled to judgment as a matter of law in accordance with Rule 56, Federal Rules of Civil Procedure.

It is necessary to state relevant facts and review the applicable law. As recited in the lease, Chilean is engaged in the business of shipping, bagging, milling and storing fertilizer and fertilizer materials and had leased warehouse, dock and terminal facilities together with all listed machinery and equipment for the express purposes of such business. As shown by the agreement, Chilean's own stated business activity was managed and operated for and on its behalf by Smith. Smith conducted Chilean's own business activity on Chilean's premises by using Chilean's instrumentalities, supplies and methods. Also by the terms of the agreement, Smith is under a duty to follow Chilean's directives and to receive and place in store *all* shipments directed to the warehouse by Chilean. (Emphasis added.) Smith is under further duty pursuant to the agreement to follow Chilean's instructions in preparing the nitrate of soda for reshipment, and Smith should bill Chilean weekly in an amount directly related to the volume and type of Chilean's business activity according to a formula fixed by the agreement. Chilean is bound by the agreement to furnish all bags necessary for the reshipment of nitrates and to furnish the machinery and equipment. Refunds of wharfage and handling on movements subject to shipside rail rates accrue to the ultimate account of Chilean and not Smith. Moreover, under the agreement, Smith must publish a schedule of tariffs which meets with Chilean's approval. All amounts collected in accordance with the tariffs are paid to Chilean with Smith retaining one-half. Smith obligates itself to work to maximum capacity pursuant to orders of Chilean. Smith further obligates itself to indemnify Chilean for any damage to the warehouse caused by Smith's employees or agents. Smith promises to return the machinery and equipment in good condition, reasonable wear and tear excepted, and to make ordinary repairs to so maintain the machinery and equipment in good operating condition. Smith is responsible for all wages of personnel and related taxes.

Chilean has an absolute right to terminate the agreement upon thirty days written notice to Smith and vice versa.

It is noted that Chilean's Vice-president elsewhere in the record repeatedly refers to Smith as Chilean's agent. Chilean's Vice-president also states that Smith was acting at Chilean's direction in doing that particular work which Smith was engaged in at the time of the fire.

Fire broke out in the warehouse while Smith's employees were using an acetylene torch to repair the links in the bucket elevator system in accordance with the proviso of the agreement that

Smith should make ordinary repairs to maintain the machinery and equipment in good operating condition. The fire spread very rapidly throughout the entire warehouse.

One of Smith's employees had been loaned to Railway for a specific purpose. However, Smith's personnel continued to carry on Chilean's activities including the use of the acetylene torch, and at the first indication of fire the loaned employee returned to the service of Smith. After the fire was spreading, a broken telephone wire impeded Smith's efforts to summon the fire department, and Smith's personnel also had difficulty turning on the water or taking any other effective countermeasures.

Heat from the acetylene torch is admitted by Chilean to have been the cause of the fire which destroyed the property, and Smith's warehouse superintendent further stated that the acetylene torch had been in use for approximately one hour when the fire broke out and that prior to the use of the acetylene torch there had been some effort to wet down the vicinity of the repairs by throwing water around in the work area.

The Lease requires Chilean to indemnify Railway for any loss to the building caused by any of Chilean's agents, and this covenant is completely unrelated to and independent of any other provisos in the lease. The lease also requires Chilean to return the listed machinery and equipment in good condition with the exception of normal wear and tear. In order to do this it is Chilean's responsibility under the lease to make ordinary repairs to maintain such machinery and equipment until such machinery and equipment is worn out to the extent that ordinary repairs are no longer sufficient, and then Railway must replace the machinery and equipment with items of like kind and quality in good working condition.

Chilean now attempts to disclaim its liability to Railway for the damage caused by the fire by asserting that the repairs undertaken by Smith for Chilean were really replacements which were the responsibility of Railway and which were purported by Chilean to be for Railway's account although the record indicates that Chilean paid Smith and never billed Railway. Moreover, Chilean never invoked the arbitration provision of the lease in order to bind Railway to Chilean's *interpretation* of the lease in this respect.

■■■ However, putting this question aside momentarily, it is clear that Smith was nevertheless making the repairs as agent of Chilean because agency is established by consent; and while Railway might possibly have had some contractual liability to Chilean under the lease if Chilean had been correct in its interpretation, Smith was not Railway's agent because Railway never consented to the establishment of such an agency relationship. The mere receipt in Railway's office of a letter from Chilean is *not* ratification for an agency relationship relating to repairs which Chilean well knew Railway had already refused to perform. Chilean's purported notification was merely another aspect of its assertion of contractual liability against Railway under the lease.

■■■ The repairs were not only performed by Chilean's agent within the scope of its agency under the agreement, but such repairs were the responsibility of Chilean under the lease. Practically every repair, no matter how ordinary, involves replacement of some item, and the mere necessity for replacing some component part is not an absolute test which indicates extra-ordinary repairs. In Dreyfuss v. Process Oil and Fuel Co., 142 La. 564, 77 So. 283, 285 (1918), the bricking up of openings and the installation of wooden partitions in a building were not regarded as ordinary repairs. However, an employee attempting to repair an elevator has been held to be engaged in making ordinary repairs. Dolph v. Maryland Casualty Co., 303 Mo. 534, 261 S.W. 330, 334 (1924). Ordinary repairs are those incidental repairs which do not materially add to the value of the property but keep it in efficient operating condition. In Re Kelley's

Estate, 47 Cal.Rptr. 897, 901, 408 P.2d 353 (1966). The word "ordinary" is defined as belonging to what is usual, (taking place according to customary occurrence or procedure, normal), while the word "extraordinary" is defined as beyond or out of the common order or rule (not of the usual, customary, or regular kind, *not* ordinary). Courtney v. Ocean Accident & Guaranty Corporation, 346 Mo. 703, 142 S.W.2d 858, 861, 130 A.L.R. 234 (1940). Ordinary repairs are such as result from ordinary wear and tear and decay, while extraordinary repairs are such as are made necessary by some unusual or unforeseen occurrence. See Courtney v. Ocean Accident & Guaranty Corporation, supra. See also Nixon v. Gammon, 191 Ky. 175, 229 S.W. 75, 77 (1921). The Court concludes, therefore, that the repairs to the links in the bucket elevator system were ordinary repairs which were the responsibility of Chilean under the lease. The repairs to the links in the bucket elevator system did not materially add to the value of the system and were not unusual or unforeseen but were to keep the system in efficient operating condition.

It is, of course, basic that one corporation such as Smith may be employed as the agent of another corporation such as Chilean and that a corporation can act only through its agents. An agent operating an independent business would normally use his own agents, who are thus subagents of the principal. Seavy, Law of Agency, § 13 at 26 (1964). Thus while the Smith Stevedoring Corporation was the agent of the Chilean Corporation, Smith could properly delegate performance, being able to act only through its agents who were therefore subagents of Chilean.

From the postulate that one corporation's relation to another corporation may be merely that of agent,[1] it follows that the tests to be applied in determining whether the agency relation exists in such circumstances will be all the usual factors weighed and cumulatively considered in the usual manner except those factors relevant to individuals, but which may be impossible to apply literally to corporate organizations. The gravamen of the given test then becomes paramount.

The facts stated are sufficient to show an agency relation of Smith to Chilean as a matter of law. Chilean's *right* to control Smith is shown by Chilean's extensive powers under the agreement including the power to terminate the agreement. Smith was employed to conduct Chilean's transactions. Smith was also employed for a considerable period of time, and Smith was using Chilean's instrumentalities on Chilean's premises. The work was part of Chilean's regular business, and it is apparent from the Agreement (corroborated by extrinsic evidence) that the parties intended to create the agency relation.

Even the provision in the Agreement that Smith is liable to Chilean for certain acts of Smith's agents or employees is consistent with the basic definition of a subagent as "an agent of an agent employed to act for the agent in performing functions undertaken by the agent for his principal, and for whose conduct the agent agrees to be responsible to his principal." See Seavy, Law of Agency, § 7 at 9 (1964).

As previously noted, under the Lease, Chilean is liable to Railway for any damage to the building caused by any of Chilean's agents and the record is clear that the repair work with the acetylene torch was the proximate cause of the fire which caused the destruction of the building. All other causes were remote, the sole proximate cause of the damage being the fire which was solely and proximately caused by the repair work with the acetylene torch.

While it may be arguable that damage to the building also included destruction of machinery and equipment in

1. Consolidated Indiana Coal Co. v. National Bituminous Coal Commission, 103 F.2d 124 (7th Cir. 1939); See also De- Ronde v. Gaytime Shops, Inc., 239 F.2d 735 (2d Cir. 1957).

the building and destroyed along with the building by the same cause, we need not pursue this hypothetical for Chilean covenanted in the Lease to return the machinery and equipment in good condition with the only exception being for normal wear and tear. A completely destructive fire obviously is not normal wear and tear, and the promise to return the machinery and equipment in good condition is otherwise unconditional. In other words, Chilean is now unable to return the machinery and equipment as contracted for, and a completely destructive fire even if assumed to be non-negligent in origin is no more normal wear and tear than negligent damage would be.[2] Thus, Chilean has breached its covenants and is accordingly liable to Railway for damages to the building, machinery, and equipment. Railway's motion for summary judgment against Chilean as to liability for fire damage to warehouse building, machinery, and equipment must be and is granted by separate order.

---

2. There has been citation of authorities from other jurisdictions for the proposition that this provision with respect to returning the machinery and equipment in good condition would require the tenant to respond only for negligent damage (which is outside the scope of normal wear and tear). However, a completely destructive fire is also clearly outside the scope of normal wear and tear.